**In re TELXON CORPORATION SECURITIES LITIGATION.**

**No. 5:98–CV–2876.**

United States District Court, N.D. Ohio, Eastern Division.

Aug. 25, 1999.

Arthur M. Kaufman, Hahn, Loeser & Parks, Cleveland, OH, for Plaintiff.

Richard S. Mitchell, Steven J. Miller, Drew A. Carson, Goodman, Weiss, Miller, Cleveland, OH, William B. Steele, Bradley W. Foster, David L. Peavler, Locke, Liddell & Sapp, Austin, TX, for Defendants.

### *MEMORANDUM & ORDER*

O'MALLEY, District Judge.

Currently pending are twenty-seven (27) putative class action lawsuits asserting securities fraud claims against defendant Telxon Corporation ("Telxon"), Frank Brick (President and CEO of Telxon), and Kenneth Haver (Senior Vice President and CFO of Telxon). Three plaintiffs, or collections of plaintiffs, have filed motions for consolidation, for appointment as lead plaintiff, and for approval of their chosen counsel, pursuant to the framework set forth in 15 U.S.C. § 78u–4. For the reasons set forth below, these cases are consolidated, the Hayman Group is appointed lead plaintiff, and its selection of lead counsel is approved. Accordingly, the Hayman Group's motion for appointment as lead plaintiff (docket no.) is **GRANTED** in part, with the limitations imposed below. The motions of the other would-be plaintiff groups are **DENIED.**

### I. Background

Telxon, a Delaware corporation, with is principal place of business in Ohio, designs and manufactures wireless and mobile information systems, distributing products and providing services in more than sixty

(60) countries. Plaintiffs are shareholders of Telxon common stock who claim to have suffered financial loss.

All of the actions share essentially the same allegations. Plaintiffs allege that, on October 20, 1998, Telxon, Brick and Haver issued misleading and false statements about the financial health of the company. Specifically, plaintiffs allege that, on that date, Telxon reported second quarter earnings for fiscal year 1999 of $.22 per share.[1] Telxon also reported significant increases in total revenue and earnings. The day after this announcement, Telxon's price per share increased seventeen percent (17%), going from $16.50 per share to $19.28 per share at closing.

Prior to the commencement of trading on December 11, 1998, Telxon announced that it would restate its 1999 second quarter earnings to reflect $14 million less in revenue and a net loss of approximately $.05 per share. The market price of Telxon's common stock dropped precipitously following this announcement; by mid-morning, the market price had dropped to $16.06 from a closing price of $27.25 the day before. Before the end of the trading day, two putative class action securities fraud lawsuits were filed against Telxon.[2] In the following days and weeks, twenty-five other putative class actions were filed. Plaintiffs allege that defendants knowingly and/or recklessly misstated Telxon's earnings for the second quarter of 1999, and that such statements were materially false and misleading. The class periods asserted in these complaints differ in some re-

spects, but the class periods in all of the complaints are based on the time frame stretching from October or May of 1998[3] through December 11, 1998, or January of 1999.

On February 9, 1999, three plaintiffs, or plaintiffs "groups," filed motions to consolidate all of the pending actions, and also sought to be appointed lead plaintiff, pursuant to 15 U.S.C. § 78u–4. These plaintiffs, or "groups" of plaintiffs, include (1) the "Alsin Group," a collection of eighteen unrelated investors; (2) the "Hayman Group,"[4] consisting of brothers William and Arthur Hayman, and an investment advisor, Steven Elkman; and (3) the Florida State Board of Administration ("FSBA"), a pension fund established for the benefit of Florida government employees and retirees;[5] the FSBA's motion for appointment as lead plaintiff accompanied a motion to intervene filed pursuant to Rule 24 of the Federal Rules of Civil Procedure.

On February 23, 1999, Telxon announced that it was again restating its earnings, this restatement encompassing both the first and second quarters of 1999, as well as fiscal years 1996, 1997, and 1998. The restated earnings for the first and second quarters of 1999 caused the company to post an approximate loss of $4.2 million during the combined quarters. The restated earnings for the 1996, 1997, and 1998 fiscal years caused an approximate $9.8 million drop in net income for those years. Following this announce-

---

1. This represented a forty-seven percent (47%) increase over the $.15 earnings per share of the same quarter one year before.

2. *Bragdon, et al. v. Telxon Corp. et al.*, 5:98cv2876, and *Park East, Inc., et al. v. Telxon Corp. et al.*, 5:98cv2880, were filed before 4:00 p.m. on December 11, 1998.

3. In the spring of 1998, Symbol Technologies, Inc. made an offer to purchase Telxon for $38 per share. On May 8, 1998, Telxon publicly announced that it was rejecting the purchase offer. Thus, some of the class periods begin with the rejection of Symbol's offer and oth-

ers begin with the alleged misstatement of earnings made in October of 1998.

4. In the briefs, this group is referred to as the "Elkman Group." Because, as explained *infra*, the Court concludes that Elkman cannot be considered a member of this group for purposes of selecting the lead plaintiff, the Court will not attach that moniker to the group.

5. The FSBA consists of a Treasurer, Comptroller, and Governor (who also serves as the FSBA's chairperson).

ment, the market price of Telxon's common stock dropped another 16%, closing at $7.1875. On March 11, the FSBA filed a complaint [6] alleging claims premised on this "second restatement," and defining the class period as beginning on May 21, 1996 and ending on February 23, 1999. The FSBA alleges that the defendants knowingly and/or recklessly misstated Telxon's earnings for fiscal years 1996, 1997, and 1998, as well as the first and second quarters of 1999, and that such statements were materially false and misleading. The FSBA also seeks appointment as lead plaintiff on the basis of losses allegedly suffered during the period covered by this second restatement.

On April 26, 1999, this Court held a hearing on the outstanding motions to consolidate and for appointment of lead plaintiff, at which the Court heard additional argument on the motions and posed a number of questions to counsel.[7] The Securities and Exchange Commission was granted leave to submit an amicus curiae brief, and, on May 4, 1999, it did so. The parties seeking appointment as lead plaintiff were permitted to file responses to that brief, and they did so in a timely fashion. The matter is thus ripe for a ruling.

## II. Law and Analysis

### A. Consolidation

The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4, 5 ("PSLRA"), effected significant procedural and substantive changes to securities fraud class actions.[8] The PSLRA requires that the Court address any outstanding motions to consolidate before considering motions for the appointment of counsel:

If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall not make the [lead plaintiff] determination ... until after the decision on the motion to consolidate is rendered. As soon as practicable after such decision is rendered, the court shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions in accordance with this paragraph.

15 U.S.C. § 78u–4(a)(3)(B)(ii).

■ All plaintiffs seeking appointment as lead plaintiff have moved to consolidate the pending actions. During the hearing on the motions, counsel for all plaintiffs were in agreement that consolidation is appropriate. Counsel for defendants did not oppose consolidation and agreed that, from their perspective, consolidation of all cases is essential for the efficient administration and management of this case.

All of the shareholder actions against Telxon share both factual and legal issues in common. Consolidation, moreover, will prevent unnecessary expense and delay. Consolidation is therefore appropriate under Rule 42(a) of the Federal Rules of Civil Procedure. Accordingly, the following actions are consolidated and all subsequent papers, pleadings, and motions shall be filed under the case number of the lowest-numbered case, *Bragdon, et al. v. Telxon Corp., et al.*, 5:98–CV–2876, **which will be re-captioned as** *In re Telxon Corporation*

**6.** As noted above, the FSBA previously had not filed a complaint in this matter, but had instead sought to intervene in the case pursuant to Fed.R.Civ.P. 24.

**7.** At the invitation of the undersigned, Magistrate Judge Patricia Hemann also participated in the hearing. Magistrate Judge Hemann will be responsible for oversight of discovery during the pendency of this action.

**8.** The PSLRA was passed over Presidential veto by a vote of 319 to 100 in the House, 141 Cong.Rec. H15, 223–24 (daily ed. Dec. 20, 1995), and by a margin of 68 to 30 in the Senate two days later. 141 Cong.Rec. S19, 180 (daily ed. Dec. 22, 1995). *See* John W. Avery, *Securities Litigation Reform: The Genesis of the Private Securities Litigation Reform Act of 1995*, 51 Bus.Law. 335, 347–353 (1996) (chronicling the PSLRA's path from bill to law from 1993 through its passage in 1995).

*Securities Litigation,* Case No. 5:98–CV–2876:

*Bragdon, et al. v. Telxon Corp., et al.,* 5:98cv2876

*Park East, Inc., et al. v. Telxon Corp., et al.,* 5:98cv2880

*Frankfort, et al. v. Telxon Corp., et al.,* 5:98cv2888

*Strachan, et al. v. Telxon Corp., et al.,* 5:98cv2890

*Fine, et al. v. Telxon Corp., et al.,* 5:98cv2891

*Palumbo, et al. v. Telxon Corp., et al.,* 5:98cv2892

*Silverman, et al. v. Telxon Corp., et al.,* 5:98cv2893

*Leviticus Partners, et al. v. Telxon Corp., et al.,* 5:98cv2916

*Haff v. Telxon Corp., et al.,* 5:98cv2917

*Gottesman, et al. v. Telxon Corp., et al.,* 5:98cv2918

*Wechsler, et al. v. Telxon Corp., et al.,* 5:98cv2929

*Moss, et al. v. Telxon Corp., et al.,* 5:98cv2930

*Lewitter, et al. v. Telxon Corp., et al.,* 5:98cv2943

*Freitag, et al. v. Brick, et al.,* 5:98cv2944

*Knowlton, et al. v. Telxon Corp., et al.,* 5:98cv2962

*Esrati, et al. v. Telxon Corp., et al.,* 5:98cv3002

*Scalisi, et al. v. Telxon Corp., et al.,* 5:98cv3031

*Kraus, et al. v. Telxon Corp., et al.,* 5:99cv0009

*Stansburg, et al. v. Telxon Corp., et al.,* 5:99cv0031

*Sprenger, et al. v. Telxon Corp., et al.,* 5:99cv0032

*Budroe, et al. v. Telxon Corp. et al.,* 5:99cv0046

*Stevenor, et al. v. Telxon Corp., et al.,* 5:99cv0071

*Buettler, et al. v. Telxon Corp., et al.,* 99cv0120

*Burkhalter v. Telxon Corp.,* 5:99cv192

*Lincoln Holdings, Inc., et al. v. Telxon Corp.,* 5:99cv211

*Salerno v. Telxon Corp.,* 5:99cv231

*FSBA v. Brick, et al.,* 5:99cv0561

An amended complaint effectuating this consolidation shall be filed by the lead plaintiff, defined below, and captioned as described above.[9]

### B. Appointment of Lead Plaintiff

The most significant procedural change effected by the PSLRA is the requirement that the Court appoint, at the initial stages of litigation, a "lead plaintiff." Specifically, the PSLRA states that

> the court ... shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff").

15 U.S.C. § 78u–4(a)(3)(B)(i). The PSLRA creates a rebuttable presumption that the most adequate plaintiff

> is the person *or group of persons* that—
>
> (aa) has either filed the complaint or made a motion in response to a notice . . .;
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.[10]

---

9. As discussed at the April 26, 1999 hearing, case nos. 5:98cv2880 through 5:99cv0561 will be dismissed without prejudice; the amended complaint in case no. 5:98cv2876 will encompass the substance of those actions.

10. Rule 23·of the Federal Rules of Civil Procedure sets forth four (4) prerequisites to a class action. Briefly, these requirements are: (1) numerosity; (2) common questions of law or fact; (3) typicality of claims or defenses; and (4) fair and adequate representation of the class by the representative parties. Fed.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I) (emphasis added).[11] This presumption may be "rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

The PSLRA also erects a presumption against the appointment as lead plaintiff of any person that has served as lead plaintiff in five (5) or more securities class actions during any three (3) year period. 15 U.S.C. § 78u–4(a)(4). Specifically, the PSLRA provides:

### Restrictions on professional plaintiffs

Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3–year period.

*Id.*[12]

As mentioned above, three plaintiffs, or "groups" of plaintiffs, are vying for selection as lead plaintiff and approval of their counsel of choice as lead counsel. The first of these groups is the "Alsin Group." The "Alsin Group" consists of eighteen (18) individual plaintiffs who collectively held approximately 332,000 shares of Telxon common stock and allegedly suffered losses of approximately $3.004 million during a class period defined as May 8, 1998 through January 27, 1999.[13] The Alsin Group also requests approval of three law

R.Civ.P. 23(a). Of principle concern with respect to the lead plaintiff determination are the third and fourth prerequisites.

**11.** Subsection (aa) refers to the notice provision of the PSLRA, which provides:

> **(i) In general**
> Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class—
> (I) of the pendency of the action, the claims asserted therein, and the purported class period; and
> (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.
> **(ii) Multiple Actions**
> If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter is filed, only the plaintiff or plaintiffs in the first filed action shall be required to cause notice to be published in accordance with clause (i).

15 U.S.C. §§ 78u–4(a)(3)(A)(i), (ii).

**12.** The PSLRA also imposed a certification requirement for the filing of securities class action complaints, requiring that each plaintiff seeking to serve as representative party on behalf of a class file, along with the complaint, a detailed certification, personally signed by the plaintiff. Specifically, the certification must state that

> (i) . . . the plaintiff has reviewed the complaint and authorized its filing;
> (ii) . . . the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter;
> (iii) . . . the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

15 U.S.C. § 78u–4(a)(2)(A)(i)–(iii). The certification also must set forth all of the transactions of the plaintiff in the particular security during the class period, as well as all other actions during the three year period preceding the complaint in which the plaintiff sought to serve as a representative party; in addition, the certification must state that the plaintiff will not accept payment for serving as a representative party in excess of the plaintiff's *pro rata* share of any recovery, with certain exceptions. *Id.* at § 78u–4(a)(2)(A)(iv)–(vi).

**13.** The financial loss figure provided by the Alsin Group, the Hayman Group, and the FSBA were calculated for purposes of the lead plaintiff motions only. These figures may or may not ultimately be the actual amount of financial loss for purposes of any appropriate legal damages calculation.

firms to serve as lead counsel, plus additional law firms to serve as part of an executive committee and as liaison counsel.

The "Hayman Group" also seeks appointment as lead plaintiff. As defined in the papers and briefs, the Hayman Group consists of three individuals: William Hayman, Arthur Hayman, and Steven Elkman. During the relevant class period, defined as the same as that of the Alsin Group, William Hayman alleges losses of $937,467, Arthur Hayman alleges losses of $150,500, and Steven Elkman alleges losses of $156,643, for a total of approximately $1,244,610.00.[14] William and Arthur Hayman are brothers. Elkman is a stockbroker who has no apparent prior or contemporaneous relationship or association with the Haymans. The Hayman Group seeks the appointment of two law firms—one to serve as lead counsel and one to serve as "liaison" counsel.

The FSBA also seeks appointment as lead plaintiff. In its February 9, 1999 motion to intervene and for appointment as lead plaintiff, the FSBA claimed losses of approximately $428,000 based on a class period defined in terms consistent with the periods alleged by the Alsin and Hayman Groups. In the complaint filed on March 11, 1999, however, the FSBA claimed losses of approximately $2,705,575, based on a class period defined as May 21, 1996 (the date on which Telxon disclosed its fiscal 1996 year-end results) through February 23, 1999 (the date on which the second restatement of earnings was made), a much broader period than any other plaintiff or plaintiff's group has asserted thus far. In arguing for appointment as lead

plaintiff, the FSBA relies upon the greater loss number; the Alsin and Hayman Groups argue that the lower number should be used in determining the FSBA's fitness for the lead plaintiff role.[15] The FSBA also seeks the appointment of two law firms to act on its behalf as lead plaintiff, one as lead counsel and one as local, or "liaison," counsel.

### 1. The Alsin Group

It is undisputed that the Alsin Group has, *in the aggregate*, suffered the greatest financial loss, no matter the loss period employed in the calculation. It also is undisputed that at least the majority of the prerequisites to class action status under Fed.R.Civ.P. 23—numerosity, commonality, and typicality—will be satisfied if the Alsin Group is designated the class representative in this case. Despite these facts, however, the Hayman Group and FSBA contend that the Alsin Group is *not* entitled to presumptive lead plaintiff status under the PSLRA. The Hayman Group and FSBA oppose the Alsin Group's appointment as lead plaintiff on two grounds: (1) the Alsin Group is not the type of "group" contemplated by the PSLRA so that the losses of the Alsin Group's members cannot, accordingly, be aggregated for purposes of assessing the financial interest at stake; and (2) the Alsin Group is too diverse and its proposed counsel structure too cumbersome to assume adequate protection of the interests of all class members.

The Hayman Group and FSBA contend the Alsin Group cannot properly call itself a "group" under the PSLRA for both

**14.** The Alsin Group challenges the calculation of this figure, arguing that it is overstated by approximately $41,000. As noted below, the Court finds that, among the putative lead plaintiffs, the Haymans have the greatest financial interest at stake, even in the absence of this disputed amount.

**15.** During the April 26 hearing, all parties seemed to be in agreement that any amended complaint filed by the lead plaintiff will be premised on the larger class period. There is a dispute at this time, however, regarding

whether the larger class period should be considered for purposes of making the lead plaintiff determination, given the sixty (60) day limitation for filing motions for appointment as lead counsel contained in 15 U.S.C. § 78u–4(a)(3)(A)(1). In their competing briefs in support of their motions for appointment as lead plaintiff, neither the Alsin Group nor the Hayman Group make any genuine attempt to calculate their respective financial losses during the larger class period.

quantitative (the group is too large) and qualitative (the members share nothing in common *other than* the fact that they all held Telxon common stock during the relevant time frame) reasons. Thus, while all parties agree that the PSLRA contemplates that a lead plaintiff may consist of more than one person, as reflected in the use of the term *"group* of persons," they disagree as to what, precisely, this means. Specifically, the Court has been presented with varying views of *who* may properly be considered a member of the group and of *how many* persons may legitimately comprise a group.[16]

The Alsin Group insists that these questions are easily answered by the statute itself: because the statute imposes no qualitative or quantitative limits on who, or what, may comprise a "group," there are no such limits, and it would run contrary to the plain and ordinary meaning of the word if the Court were to read such limits into it. According to the Alsin Group, therefore, a "group" in this context is nothing more—and nothing less—than an aggregation of shareholders who held Telxon common stock during the applicable class periods and suffered financial losses as a consequence. A "group" under this view may be very small or very large, and its members may either share everything in common or nothing in common. Indeed, counsel for the Alsin Group conceded during the hearing on this matter that, under this reading of the statute, a group could even consist of *all* plaintiffs who had asserted claims against a defendant corporation.[17]

The Hayman Group and FSBA urge a more restrained interpretation of the term "group." While both agree that the PSLRA's plain language contemplates that a lead plaintiff can consist of more than one person, they contend that the Alsin Group's liberal interpretation of the word cannot be squared with the purposes behind the PSLRA. Specifically, the Hayman Group and FSBA argue that an interpretation that allows unlimited numbers of unrelated persons to form a "group" would

**16.** According to one commentator, "[t]he most important open question under the lead plaintiff section of the PSLRA is whether unrelated individuals or institutions may aggregate their shares in order to be deemed the 'most adequate plaintiffs' . . ." John C. Coffee, Jr., *Developments Under the Private Securities Litigation Reform Act of 1995: The Impact After Two Years*, SC53 ALI–ABA 395, 423 (1997). In an earlier article, Professor Coffee metaphorically described the PSLRA as "wet clay that has been shaped into an approximation of human form by an apprentice craftsman and has now been turned over to the master sculptor for the details that will spell the difference between high art and merely competent mediocrity." John C. Coffee, Jr., *The Future of the Private Securities Litigation Reform Act: Or, Why the Fat Lady Has Not Yet Sung*, 51 Bus.Law. 975, 975 (1997).

**17.** This point was conceded during the following colloquy with the Court:

THE COURT: Under your theory[,] couldn't you all have walked in here and said we're all one group, we're going to all aggregate together so by definition we have this huge amount of loss and we want to all be co-lead plaintiffs with all these co-lead counsel?

MR. SCHULMAN: Could all of the . . . counsel have proposed that to the Court, is that the Court's question?

THE COURT: Uh-huh.

MR. SCHULMAN: I have seen judges welcome that kind of agreement.. Yes, we could have done so. In fact, efforts have been made and they were unsuccessful[,] so we have three warring camps.

Tr. at 37–38. This sentiment was expressed in a subsequent exchange as well:

THE COURT: Just so I'm sure I completely understand, if you have a body of losses and you know that the total losses with respect to the relevant period was X, then assuming that you go out and get enough people that aggregate to 51 percent of X, then you know for sure under your theory you would walk in here with the presumption in your favor.

MR. SCHULMAN: Obviously I have never seen that but I'm assuming that to be true.

THE COURT: But your argument is that simple in the sense that[,] whenever the numbers get that high[,] that's it. That's at least the presumption.

MR. SCHULMAN: Exceedingly simple, and the statute is exceedingly simple.

Tr. at 44–45.

Reasoning

frustrate the PSLRA's attempt to put a stop to lawsuits by "professional plaintiffs," and those lawyers who regularly recruit such plaintiffs. To arrive at this reading of the statute, the Hayman Group and the FSBA urge the Court to delve deeply into the Act's legislative history.

■ In determining the meaning of a term or word used in a statute, the Court must begin with the "usual [plain] and ordinary meaning" of that term or word, unless a special meaning is provided in the statute itself. *See In re Comshare, Inc. Securities Litigation*, 183 F.3d 542, 549 (6th Cir.1999) (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). *See also Moskal v. United States*, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) ("In determining the scope of a statute, we look first to its language, giving the words used their ordinary meaning."); *Cf.* Cass R. Sunstein, *Legal Reasoning and Political Conflict* 187 (1996) ("It seems reasonable to say that judges should rely on the ordinary meaning of statutory language, taken in the context of the statute as a whole and the period in which it was enacted."). The most useful tool for determining the usual and ordinary meaning of a word or term is the dictionary. *See United States v. LaBonte*, 520 U.S. 751, 757, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) (relying on dictionary definition for ordinary meaning of term).

While the meaning of "group" urged by the Alsin Group finds *some* support in the dictionary,[18] it would be an exaggeration to say that it is the "usual," "plain," or "ordinary" meaning ascribed to the word. Indeed, the majority of dictionary definitions suggest that it would be *a departure* from the "usual and ordinary" meaning of the term to conclude that the disparate inves-

tors who make up the Alsin Group truly comprise a "group."

For instance, *Webster's Third New International Dictionary* defines "group" as follows:

**1:** two or more figures ... forming a distinctive unit complete in itself or forming part of a larger composition ... **2a:** a relatively small number of individuals assembled or standing together ...—compare CROWD **b:** an assemblage of objects regarded as a unit because of their comparative segregation from others {a ˜of buildings} {a ˜of towns ...} ... (1): a cluster of islands {the ˜consists of four tiny islands} ... (2): a cluster of hits on a target fired with the same sight setting and the same point of aim **3:** a number of individuals bound together by a community of interest, purpose, or function

*Webster's Third New International Dictionary* 1004 (ed.1986).

*Merriam Webster's Collegiate Dictionary* similarly defines "group" as

**1:** two or more figures forming a complete unit in a composition **2a:** a number of individuals assembled together or having some unifying relationship **b:** an assemblage of objects regarded as a unit ... **3a:** an assemblage of related organisms....

*Merriam Webster's Collegiate Dictionary* 515 (10th ed.1994).

The dictionary definitions attribute to "group" certain characteristics. A "group" is, for example, a smaller, identifiable subset of a larger population, sharing a common, defining characteristic which serves to distinguish them from that larger population. The word, thus, means more than a mere random collection of unrelated individuals or things. For instance, when one refers to a "group" of buildings in a city, one generally is not speaking about *all* of

---

**18.** The online version of *Webster's Revised Unabridged Dictionary* provides a definition of "group" which seems to support the Alsin Group's interpretation, defining it as "[a] cluster, crowd, or throng; an assemblage, ei-

ther of persons or things, *collected without any regular form or arrangement.*" *Dictionary.com/group* (last edited Feb. 3, 1998) <http://www.Dictionary.com/group> (emphasis added).

the buildings in a city, but to a specific subset of buildings, like those located in a certain area, or those sharing a certain architectural feature. Likewise, when one refers to a "group" of persons in a crowd, one generally would be understood to be referring to a specific subset of the crowd, for instance, individuals standing on a particular corner, or engaged in an activity in which the rest of the crowd is not participating. Thus, most of the readily discernable definitions suggest there is more to a "group" than what the Alsin Group claims.

The Court will not "make a fortress out of the dictionary," however. *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.) (Hand, J.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). While the dictionary is a useful starting place, it does not provide an answer by itself, particularly where alternative, viable definitions can be found.

■ Going beyond the dictionary does not require immediate resort to legislative history, as the Hayman Group and FSBA urge, however. Other principles of statutory construction must be exhausted. The Court must first consider whether the meaning of a disputed term can be determined by placing it in the context and overall scheme of the statute, and construing it with the purposes of the statute in mind. *See Deal v. United States*, 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993) (stating that it is a "fundamental principle of statutory construction (and, indeed, language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used"); *Flores v. Rios*, 36 F.3d 507, 513 (6th Cir.1994) ("Laws cannot be interpreted by snatching single words out of statutory sentences and matching these words—without regard for context—up against one of the many definitions of that word found in the advocate's dictionary of choice."). It is only where the structure, context, and overall scheme of the statute fail to yield a reasonable interpretation of the term that the Court will resort to legislative history.[19]

Examination of the lead plaintiff provisions of the PSLRA reveals that they speak in the singular in all instances save one: the reference to "group of persons." In all other instances, the statute uses the singular "person." For instance, the "Restrictions on professional plaintiffs" section of the statute states that "a *person* may be a lead plaintiff ... in no more than 5 securities class actions ... during any 3–year period," 15 U.S.C. § 78u–4(a)(3)(B)(vi), but does not expressly impose such a restriction on a "group of persons." Without exception, these provisions of the PSLRA speak of a single plaintiff; on their face, they do not contemplate multiple plaintiffs. Other courts have made this same observation. *See, e.g., In re Milestone Scientific Securities Litigation*, 183 F.R.D. 404, 416–17 (D.N.J. 1998) ("Significantly, apart from the sole reference to 'a group of persons,' the PSLRA is worded in the singular, providing a mechanisms of the appointment of 'the most adequate plaintiff,' not the most adequate plaintiffs.").

At least one court has concluded that the statute's persistent use of the singular

---

**19.** Justice Scalia has identified several problems with slavish reliance on legislative history:

Ironically, but quite understandably, the more courts have relied upon legislative history, the less worthy of reliance it has become. In earlier days, it was at least genuine and not contrived—a real part of the legislation's *history*, in the sense that it was part of the *development* of the bill, part of the attempt to inform and persuade those who voted. Nowadays, however, when it is universally known and expected that judges will resort to floor debates and (especially) committee reports as authoritative expressions of "legislative intent," affecting the courts rather than informing the Congress has become the primary purpose of the exercise. It is less that the courts refer to legislative history because it exists than the legislative history exists because the courts refer to it. . . .

Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 34 (1997).

precludes both the appointment of co-lead plaintiffs and the appointment of a group comprised of a random assemblage of unrelated persons who are unable to function as a single, cohesive unit: "While the PSLRA refers to 'a person or group of persons' as capable of serving as the lead plaintiff, the surrounding statutory language forecloses the appointment of multiple groups or multiple persons not part of a cohesive group." *Id.* This Court agrees that the context and structure of the PSLRA evince an intent that a "group" consist of more than a mere assemblage of unrelated persons who share nothing in common *other than* the twin fortuities that (1) they suffered losses and (2) they entered into retainer agreements with the same attorney or attorneys.

The PSLRA does allow more than one person to serve as the lead plaintiff; it would be inconsistent with the PSLRA's facial disapproval of multiple *plaintiffs*, and its persistent use of the singular terms person and plaintiff, however, to allow a melange of unrelated persons to serve as the lead plaintiff, especially if multiple law firms are to represent their interests. Such a "group" would be a "lead plaintiff" in name only; in substance, those individuals would essentially constitute a collection of lead plaintiffs, unbound by any allegiance to one another and unlikely to function as a unified whole. In such circumstances, the Court would be left with little assurance that the "group" speaks with a collective voice. Thus, the overall context in which the term "group" appears strongly suggests that the meaning of the term is more constrained than the Alsin Group contends.

That "group" means something more than melange or hodgepodge—the terms most consistent with the composition of the Alsin Group—is confirmed by an examination of the underlying premise of the statute and the purposes it is designed to accomplish. All parties, even the Alsin Group, acknowledge that one of the purposes of the PSLRA is to make it more difficult, if not impossible, for so-called "professional plaintiffs" to assume the lead plaintiff role in securities class action litigation. Indeed, that intent is expressed in the language of the statute, specifically, the heading entitled "Restrictions on Professional Plaintiffs."

The term "professional plaintiff" (in the securities context) originated in the financial, legal, and academic press; it did not appear for the first time in the PSLRA. "Professional plaintiff" was ordinarily used to describe a plaintiff with small, often nominal holdings. For instance, in an influential law review article published in the months prior to the passage of the PSLRA, the term "professional plaintiff" was used to describe a plaintiff with "widely dispersed and thinly spread stockholdings." *See* Elliot J. Weiss and John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J.2053, 2059 n. 28 (1995) (hereinafter "Weiss & Beckerman"). *See also* Anthony Borden, *The Shareholder Suit Charade* American Lawyer 70 (Dec. 1989) ("Established firms rely on a stable of *professional plaintiffs* whose diverse and often thinly spread holdings provide a base from which to attack almost any transaction.") (emphasis added). The term professional plaintiff generally is used to refer to a plaintiff who is either a frequent filer (in the years before the PSLRA, some plaintiffs would file upwards of twenty or thirty securities class action complaints in only a few years), or a "hired gun" (one who allows an attorney to sue in his name in exchange for a fee), or both. *See* Weiss & Beckerman, 104 Yale L.J. at 2059 n. 28. All professional plaintiffs share one very important characteristic in common, however: they have relatively small amounts of money invested in any one security and typically suffer relatively small financial losses.[20]

**20.** At the April 26 hearing, counsel for the

Alsin Group provided a fairly apt nutshell

Reference to the academic literature in existence at the time the PSLRA was passed is useful in understanding the evil Congress perceived and the problems it sought to address with the Act. The problem with "professional plaintiffs" stems from their relatively nominal interest in securities class action litigation *vis a vis* the relatively large interest at stake for their attorney. Whereas the plaintiff with only a few shares of stock might have suffered losses amounting to no more than one hundred dollars, even less in some instances, the attorney's interest generally is much greater because of the aggregation of all claims in the class. This divergence of financial interests creates significant agency costs on a lead plaintiff with respect to his ability to monitor the attorney's conduct during the prosecution of a securities class action. As professors Weiss and Beckerman explain:

> [A] named plaintiff who has only a nominal financial interest in a class action, especially a plaintiff that an attorney has "recruited," is unlikely to monitor effectively her attorney's prosecution of the action or the terms on which her attorney recommends that the action be settled. Indeed, attorneys generally can influence strongly, if not control, the terms on which their clients agree to settle suits other than class actions because an attorney's knowledge about the law and how it applies to the facts almost always is superior to that of her client. In other kinds of litigation, however, a lawyer's ability to succeed often will depend to some degree on her client's cooperation. Moreover, the client, in principle if not in fact, retains the power to accept or reject any settlement her lawyer recommends. The client also has the power to bargain with her lawyer, in advance, about the terms on which the lawyer will be compensated.

> *None of these constraints is present when class actions are settled. Plaintiff's attorneys typically do not rely on named plaintiffs for vital testimony, do not bargain with named plaintiffs over the fees they will be paid, and do not require named plaintiffs' approval of the terms on which they propose to settle class actions.*

*Id.* at 2065 (emphasis added) (internal footnotes omitted). In addition, "[m]embers of the plaintiff class in a large class action or shareholder's derivative suit often have claims so small that the litigation is a matter of relative unimportance to them. Even though the claims in the aggregate may be very large, the small size of the individual claims creates enormous free-rider effects: no rational plaintiff would take on the role of litigation monitor because she would incur all the costs of doing so but would realize only her pro rata share of the benefits." Jonathan R. Macey and Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U.Chi. L.Rev. 1, 19–20 (1991). "These collective action and free-rider effects allow the plaintiffs' attorney in class and derivative cases to operate with nearly total freedom from traditional forms of client monitoring." *Id.* at 20. The Third Circuit echoed this concern in a pre-PSLRA derivative action, "[s]hareholders with well-diversified portfolios or small holdings lack the incentive and information to police settlements—the costs of policing typically outweigh any *pro rata* benefits to the shareholder." *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1309 (3d Cir.1993). *See also id.* at 1309 n. 9 ("Generally, the costs of monitoring will exceed the *pro rata* benefit to any single shareholder even though they may be lower than the benefits to all.").

It was this problem, of agency costs and collective action, which Congress sought to

---

definition of "professional plaintiffs" as "people who bought one or two shares and ran to the courthouse after the stock dropped and

argued [that] they should become lead counsel [plaintiff]." Tr. at 37.

tackle in the PSLRA's lead plaintiff provision. While high agency costs and collective action difficulties cannot be eliminated for the class as a whole, they can be reduced for the lead plaintiff, who functions as the leader and spokesperson for the class. The PSLRA's detailed lead plaintiff requirement represents an obvious attempt to accomplish this. This concern permeates the statute. It is reflected in the certification requirements, which ensure that the plaintiff is not a "hired gun," employed by the attorney to generate a quick settlement and fee. It is reflected in the prohibition on serving as lead plaintiff in more than five actions in any three year period, which serves to prevent "frequent fliers" from monopolizing the lead plaintiff role. It is reflected in the "most adequate plaintiff" provision, which serves to prevent a nominal plaintiff from *ever* becoming the lead plaintiff. The effect of this provision is to place the leadership of the class in the hands of a plaintiff who has suffered a large enough *pro rata loss* that he will benefit from monitoring his attorneys' conduct. This is apparent without resort to the legislative history.[21]

The Alsin Group contends that, even accepting that this is a purpose of the PSLRA, a larger group would be more effective at accomplishing it than a smaller one. While this view finds some, albeit meager, support in the case law, *see, e.g., D'Hondt v. Digi Int'l, Inc.,* 1997 WL 405668, at *3 (D.Minn. Apr. 3, 1997); *Chill v. Green Tree,* 181 F.R.D. at 408 (quoting *D'Hondt* ), this Court does not agree that a larger group can more effectively monitor litigation than a smaller group. Indeed, such a proposition seems to run contrary to the above-identified purpose of the PSLRA, particularly where, as here, the group is diverse and already has evidenced that it is either unable or unwilling to agree on a single counsel to act on its behalf and serve as its voice.

The larger the group, the less incentive any single member of the group—and certainly the group as a whole—will have to exercise any supervision or control over the litigation. In the case of a single plaintiff, the agency costs are those costs associated with the monitoring of and communication with the plaintiff's attorney by the individual plaintiff. Where more than one person is involved—whether it be in the context of a "group of persons" seeking to serve as lead plaintiff, or in the context of an attempt by various person to become *co-lead plaintiffs* —there is an additional cost associated with intragroup communication and monitoring. The

21. Though the Conference Report does, in fact, support this interpretation. Relying on the Conference Report, a number of courts also have concluded that the purpose of the PSLRA is to place control of securities class actions in the hands of plaintiff/investors, and out of the hands of attorneys. *See In re Nice Systems Securities Litigation,* 188 F.R.D. 206 (D.N.J.1999) (stating that "Congress enacted the [PSLRA] ... to remedy perceived abuses in the securities class action litigation" and identifying the use of professional plaintiffs and control by attorneys as two of the chief abuses); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 407 (D.Minn.1998) ("This grant of authority to the Courts ... was intended to stem the influence of 'professional plaintiffs' who frequently appear as named plaintiffs, and to 'empower investors so that they, not their lawyers, control private securities litigation....' By this provision, 'Congress sought to eliminate figurehead plaintiffs who exercise no meaningful supervision of the litigation.' ") (quoting Sen.Rep. No. 104–98, 104th Cong., 1995 U.S.C.C.A.N. 679, 683, 685 (Conference Report); and *Ravens v. Iftikar,* 174 F.R.D. 651, 661 (N.D.Cal.1997), respectively). *See also In re Baan Company Securities Litigation,* 186 F.R.D. 214 (D.D.C. 1999) ("Congress's principal focus, as reflected in the legislative history, was that plaintiff investors, and not their counsel, make the ultimate strategic decisions in litigation.") (citing Conference Report); *In re Donnkenny Inc. Securities Litigation,* 171 F.R.D. 156, 157 (S.D.N.Y.1997) ("One of the principal legislative purposes of the PSLRA was to prevent lawyer-driven litigation. Appointing lead plaintiff on the basis of financial interest, rather than on a 'first come, first serve' basis, was intended to ensure that institutional plaintiff with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers.") (citing Conference Report).

greater the number of persons comprising the group, the more difficult it is for those persons to communicate with each other, and to speak with a single, coherent voice when making decisions about the conduct of the litigation, or, more precisely, the conduct of the attorney or attorneys in prosecuting the litigation. With the lead plaintiff group splintered and with no authoritative voice with which to exercise control over counsel, counsel is no more effectively controlled than in the pre-PSLRA era.

This is especially so if the group consists of not only a larger number of persons, but also of persons who bear no relation and have no connection with one another beyond the fact that they suffered financial loss as a result of a drop in the price of their shares of stock. Without some cohesiveness within the group, or something to bind them together as a unit, there is no reason for the individual members of the group to speak and act with a uniform purpose. Aggregating claims simply for the purpose of creating the largest financial loss would do nothing to reduce the agency cost and collective action problems associated with the former regime. Aggregation in such instances will not change the fact that no one member of the "group" will have the financial incentive to monitor, and, because there is no reason for the individual members to act collectively (no structure for decision making, etc), the group as a whole will not engage in monitoring. Thus, the problem sought to be remedied by the PSLRA's lead plaintiff provisions would remain unaddressed.

The Alsin Group concedes that its members are unrelated to one another in any way other than the fact that they suffered

financial losses by virtue of their purchase of Telxon stock.[22] These persons do not seek appointment as lead plaintiff as a group on the basis of any pre-existing affiliation. It is truly a random assortment of persons. Such an amalgamation is simply inconsistent with the definition of group intended by the PSLRA, as revealed by the statute's language, context, overall scheme, and purpose.

The Hayman Group and FSBA contend, moreover, that, even if the Court did not reach this conclusion—i.e., that the Court allowed aggregation of the Alsin Group losses in measuring the would-be lead plaintiffs' respective financial interests, the Alsin Group is still not entitled to presumptive lead plaintiff status. The competing plaintiffs contend that this is so because the cumbersome nature of the Alsin Group's proposed multi-counsel arrangement prevents it from adequately representing the class.

The PSLRA requires the Court to assess a would-be lead plaintiff's adequacy at two stages: (1) as part of an assessment of the its suitability for presumptive lead plaintiff status, 15 U.S.C. §§ 78u–4(a)(3)(B)(i), (iii)(I); and (2) as part of its assessment of whether any lead plaintiff presumption should be disregarded. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). Thus, by including the prerequisites of Rule 23 of the Federal Rules of Civil Procedure, § 78u–4(a)(3)(B)(i), (iii)(II), the PSLRA assures that no party will be entitled to lead plaintiff status unless they will "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(A)(4). The PSLRA then assures that the question of adequacy will be revisited by providing that any presumption in favor of a particu-

---

**22.** There was some suggestion at the hearing that the mere fact that individual persons selected the same attorney to represent them should have some bearing on whether they should collectively be considered a group. This fact, standing alone, must be insufficient, however, to turn a collection of previously unassociated individuals into a group for purposes of the PSLRA. Indeed, to say otherwise would be to replace the single professional plaintiff with a group of professional plaintiffs. This is especially so where, as here, the group defined as the Alsin Group has actually chosen *numerous* attorneys to represent them, none of whom appear prepared to relinquish at least some measure of control over their client's respective fate.

lar lead plaintiff can be rebutted if the Court concludes that that plaintiff, or plaintiffs, and his, her, their, or its counsel, will not "fairly and adequately protect the interests of the class" or are "subject to unique defenses" that could operate to the prejudice of the class as a whole. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).[23]

Rather than select one counsel or firm to speak for the class, or even two firms acting as lead and local (liaison) counsel for the same client or clients, the Alsin Group proposes a three-tiered counsel structure, with three firms (separately retained by separate plaintiffs) to act as lead counsel, an "Executive Committee" of counsel consisting of seven law firms, and the designation of yet an additional firm to serve as liaison counsel. While the Alsin Group has never fully explained how it envisions this structure will work in practice, it is clear that the model envisioned by the PSLRA—one strong plaintiff with one counsel who will speak on its behalf— is not what the Alsin Group proposes.

The Court does not question the talent or experience of the law firms involved in the Alsin Group's governance structure. The structure itself, however, raises serious questions about these firms' ability to represent "adequately" the interests of a broad class of plaintiffs. At a minimum, from among the counsel structures before the Court, the Alsin Group's proposal does not appear to be the most conducive to a unified, coherent presentation of the plaintiffs's claims. Regardless of the stage at which one assesses "adequacy," the very counsel structure proposed by the Alsin Group would seem to damn its ability to satisfy that critical requirement.

Accordingly, the Court concludes that the Alsin Group is not entitled to lead plaintiff status in this case, both because the claims of its members cannot be aggregated or grouped under the PSLRA, *and* because the counsel structure it proposes would inhibit the fair and adequate representation of the plaintiff class as a whole. The Court now turns to the FSBA's request to serve as the lead plaintiff.

### 2. The FSBA

■ Both the Alsin and Hayman Groups oppose the FSBA's appointment as lead plaintiff on a number of grounds. First, both assert that the FSBA does not have the greatest financial loss during the loss period the Court must consider *at this stage of the proceedings*. That is, because the FSBA did not file a complaint asserting claims for $2,705,575 until after the sixty (60) day window for seeking lead plaintiff status, 15 U.S.C. § 78u–(a)(3)(A)(1), had expired, the FSBA's eligibility for lead plaintiff status must be based on the claimed losses of $428,000 asserted in its original motion for intervention and appointment as lead counsel.[24] The competing plaintiff groups next insist that the FSBA is barred from serving as the lead plaintiff in this action because it has served as lead plaintiff in at least five (5) other securities class actions in the past three (3) years. The Hayman and Alsin Groups also contend, moreover, that the FSBA lacks standing to act as lead plaintiff on behalf of an unaffiliated plaintiff class in *any* proceeding and is otherwise subject to unique defenses which prevent it from adequately representing the inter-

**23.** It is unclear why the drafters of the PSLRA included this precise same prerequisite at two different stages in the lead plaintiff analysis. Perhaps it was an oversight. Perhaps the first inquiry is merely a threshold inquiry and the second is meant to be a comparative inquiry (*i.e.*, who among the proposed lead plaintiffs, who may have identical losses, is the *most* adequate). Whatever the reason, the fact of its repetition evidences the importance of the adequacy requirement.

**24.** There is also some debate over the accuracy of the FSBA's loss calculations for *either* period. Because of the Court's resolution of the other objections to the FSBA's request to serve as lead plaintiff, the Court need not delve into the intricacies of the loss calculations *at this stage of the proceedings*.

est of the overall plaintiff class.[25]

■ Because the Court agrees that the FSBA does not have the largest financial interest in this litigation *for purposes of the pending lead plaintiff motions,* and because the Court concludes the FSBA is otherwise barred from serving as the lead plaintiff in this case because of its serving, or having served, as lead plaintiff in five (5) other securities class actions during the last three (3) years, the Court need not and does not now resolve the question of the FSBA's standing or attempt to determine precisely what defenses are assertable against it.[26]

The Alsin Group contends that, for purposes of the lead plaintiff determination, the size of the FSBA's financial loss must be determined solely by reference to the smaller loss figure of $428,000 asserted in its February 9, 1999 motion for intervention and for appointment as lead counsel, rather than the larger $2,705,575 figure asserted in its March 11, 1999 complaint based on a more expansive class period. While the Alsin Group, as well as the other plaintiffs in this action, acknowledged at the hearing that the larger class period likely will be alleged in the amended complaint that will follow this Order, the Alsin Group nonetheless argues that the losses associated with the larger class period should not be considered for purposes of the pending motions for appointment as lead plaintiff. The Court agrees.

As previously explained, the PSLRA provides that lead plaintiff motions be filed "not later than 60 days from the date on which ... notice is published." § 78u–4(a)(3)(A)(i).[27] Where more than one action is filed, the time begins to run from

the filing of the first-filed action, and, thus, the sixty (60) day limitation is calculated on the basis of the date on which notice for the first-filed action is published. In this case, time began to run on December 11, 1998. As required, notice was published within twenty (20) days; indeed, the *Bragdon* plaintiffs published a notice on the *Business Wire* on the same date the complaint was filed, December 11, 1998. The lead plaintiff motions then were filed within sixty (60) days of that notice, on February 9, 1999. The window for filing motions for appointment of lead plaintiff, therefore, closed on or about February 9, 1999. The FSBA's amended complaint was not filed until March 11, 1999, however, some thirty (30) days after the expiration of the deadline for filing lead plaintiff motions; indeed, the FSBA's amended complaint was not filed until the briefing on the motions for appointment of lead plaintiff was almost completed.

The PSLRA is unequivocal and allows for no exceptions. All motions for lead plaintiff must be filed within sixty (60) days of the published notice for the first-filed action. The plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has closed.

The PSLRA imposes strict time requirements. It even requires that the Court *consider* any motion for lead plaintiff within ninety (90) days of the date on which notice is published. The obvious intent of these provisions is to ensure that the lead plaintiff is appointed at the earliest possible time, and to expedite the lead plaintiff

25. At the hearing on this matter, the Court discussed its concern with the fact that counsel for the Alsin Group, who vigorously argued against the FSBA's ability to serve as lead plaintiff, may be actively representing the FSBA in another currently pending action. While the FSBA agreed to waive any conflict for purposes of going forward with the April 26, 1999 hearing, the Court notes that this issue has not been resolved.

26. It does appear, however, from the materials submitted to the Court after the April 26, 1999 hearing, that the Alsin Group's concerns about the FSBA's standing may not be well-founded.

27. Notice must be published "[n]ot later than 20 days after the date on which the complaint is filed." § 78u–4(a)(3)(A)(1).

process. *See Steiner v. Weiser*, No. 1:98cv0264, slip op. at 11 (N.D.Ohio July 16, 1998); *see also Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, at *4 (N.D.Ill. Aug. 11, 1997). Courts have held that new notices need not be filed when an amended complaint asserting a different class period is filed, because a contrary rule "would mean that the lead plaintiff could not be appointed until sixty days after the publication of the last notice related to that securities litigation." *Lax* at *4. Consequently, "[i]n some cases, appointment of lead counsel could be delayed indefinitely if new complaints alleging earlier starting dates for the class periods were filed[, and s]uch a result would clearly thwart the intent of the PSLRA, which was meant to have lead plaintiffs appointed as soon as practicable." *Id. See also Steiner* at *11 (echoing this statement).

The same result would follow if persons seeking appointment as lead plaintiff were allowed to manipulate the size of their financial loss by enlarging the class period or adding additional persons to a "group" in supplemental filings. As in this case, the consequent greater loss asserted would invite additional briefing by the other persons seeking appointment as lead plaintiff, which, in turn, would necessitate responses by the person or group of persons seeking to enlarge their losses. This would effectively render the strict timeliness set forth in the PSLRA meaningless, and would nullify Congress's attempt to expedite the lead plaintiff appointment process.

The expanded class period alleged in the FSBA's March 11, 1999 complaint was spawned by Telxon's February 23, 1999 second restatement of earnings. It was not, therefore, a crass attempt to manipulate the size of the FSBA's losses based on information available to it at the time of its original lead plaintiff motion. The motives of the FSBA, however, are irrelevant to the fact that supplementation is not contemplated by the PSLRA, and do not alter the fact that supplementation after the expiration of the sixty (60) day period would not only be inconsistent with the language and purposes of the PSLRA, but would effectively nullify the time limits expressly provided therein.

The FSBA's complaint not only was filed after the expiration of the sixty (60) day period, but also was filed after the expiration of the ninety (90) day period in which the Court must begin its consideration of the motions. Briefs addressing the FSBA's greater loss numbers thus continued to be filed with the Court until shortly before the April 26, 1999 hearing, and the Court's consideration of the competing arguments added to the delay in ruling on the motions for appointment as lead plaintiff.[28] Accordingly, consistent with the express terms of the PSLRA, and in order to dispose of the lead plaintiff determination in the most expeditious manner, the Court concludes that the class period and loss figure asserted in the original motion for appointment as lead plaintiff controls, and cannot be supplemented or augmented beyond the sixty (60) day window established by the PSLRA. Therefore, the suitability of the FSBA for lead plaintiff status must be based on the financial loss of $428,000 asserted in its original motion for appointment as lead plaintiff and motion to intervene. Because this figure is lower than that of the Hayman Group, the FSBA cannot be deemed the presumptively most adequate plaintiff.

Even if the FSBA were able to assert the greater loss figure, however, its motion for appointment as lead plaintiff would have to be denied for an additional and

---

**28.** There is also an issue of fairness. The Hayman and Alsin Groups did not calculate their losses on the basis of the larger class periods. Thus, the Court would be comparing apples with oranges in evaluating the respective losses of the parties moving for appointment as lead plaintiff. The only way to overcome this would be to allow the other parties seeking appointment to file supplemental briefs addressing the losses they suffered during the enlarged class period. This would further delay consideration and resolution of the lead plaintiff motions.

independent reason: it has served as lead plaintiff in five securities class actions in the last three years.

The PSLRA expressly prohibits a person from serving as a lead plaintiff in *more than* five (5) securities class actions during any three year period, "[e]xcept as the court may otherwise permit, consistent with the purposes of this section." 15 U.S.C. § 78u–4(a)(3)(vi). The FSBA concedes that it has served as the lead plaintiff in more than five (5) securities class actions in the last three years; indeed, the FSBA admits that it is *presently* serving as a lead plaintiff in at least one other securities class action.[29] The face of the statute thus appears to impose a *presumptive* bar against the FSBA's appointment as lead plaintiff in this action and places the burden on the FSBA to demonstrate why the bar should not be applied in this instance.

The FSBA argues that the legislative history of the PSLRA establishes that this prohibition was not intended to apply to institutional investors like it. In support, the FSBA relies on a statement made in the Conference Report which accompanied the bill version of the PSLRA that was ultimately approved. That report states:

Institutional investors seeking to serve as lead plaintiff may need to exceed this limitation and do not represent the type of professional plaintiff this legislation seeks to restrict. As a result, the Conference Committee grants courts discretion to avoid the unintended consequences of disqualifying institutional investors from serving more than five times in three years.

H.R.Rep. No. 104–369, 104th Cong. at 35.

The statute itself contains no express blanket exception for institutional investors. The statute merely grants courts discretion to ignore the prohibition in some instances, as long as doing so would be "consistent with the purposes of this section." The FSBA argues that the Conference Report is strong evidence that ignoring the prohibition in this instance would be "consistent with the purposes" of the PSLRA. Indeed, the FSBA's argument appears even stronger than this; the FSBA seems to argue that, not only should the Conference Report inform the Court's decision, it should control that decision. The Court is not willing to place that much stock in the Conference Report.

As an initial matter, the Court notes that the Conference Committee has no authority to grant courts discretion to do anything. The Conference Committee's pronouncements are not the law and are not a part of the statute. They, may, in some instances, be relevant for resolving ambiguities in the language, but they are no more authoritative than other sources of statutory interpretation, and, in many instances, are actually less so. The statute is the law, not what the Conference Committee says the statute means.[30]

29. As the FSBA correctly points out, contrary to the way the issue is framed by the Alsin Group, the standard is not whether a person has sought, or is seeking appointment as a lead plaintiff in more than five (5) securities class actions; the standard is whether the person has served or is actually serving as a lead plaintiff in five or more securities class actions. The number of actions in which a putative lead plaintiff is *seeking* appointment, however, is relevant to whether the Court should exercise its discretion to lift the bar in particular instances, as explained *infra*.

30. Conference Reports generally are viewed with less suspicion and are deemed more reliable than other sources of legislative history, like committee reports or floor statements of individual legislators. One court has even said of conference reports that, "next to the statute itself[,] it is the most persuasive evidence of congressional intent." *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C.Cir.1981). *See also Resolution Trust Corp. v. Gallagher*, 10 F.3d 416, 421 (7th Cir.1993); *Norfolk & Western Ry. Co. v. United States*, 869 F.Supp. 974, 979 (C.I.T.1994) ("A fruitful source of legislative history … is [the] … conference report.") Nonetheless, the Conference Report does not constitute the law, but is, instead, a gloss placed on the law by members of the House and Senate (or, more accurately, their staff), which is intended to persuade

If Congress had intended to grant a blanket exemption from operation of the rule to institutional investors like the FSBA, it could easily have stated that "unless the person is an institutional investor and except as the court may otherwise permit." For whatever reason, Congress chose not to speak in such absolutes. Thus, the purported blanket exemption reflected in the Conference Report cannot be squared with the more limited grant of discretion contained in the statute itself. It would turn the grant of discretion into a mandatory instruction *requiring* courts to excuse an institutional investor from the rule.[31]

There is no doubt, as even the Alsin Group concedes, that, throughout the PSLRA's legislative history, there is repeated mention of the need to increase participation in securities fraud class actions by institutional investors; it could even be said that the legislative history reflects a *preference* for institutional investors. That fact cannot be denied. But the reading urged by the FSBA would transform a preference for institutional investors into a monopolization of PSLRA actions by institutional investors. If it is true that institutional investors generally will have the greatest financial loss, as the FSBA argues, and if it is also true, as the FSBA further argues, that institutional investors may serve as lead plaintiffs without regard to the limitation in § 78u–4(a)(3)(vi), then there is no doubt that institutional investors will come to dominate securities class actions, and that all other investors will essentially be disenfranchised from the lead plaintiff role. There

may well be sound policy reasons for the monopolization of the lead plaintiff role by institutional investors, and there may be qualities and characteristics peculiar to the institutional investor (aside from the size of its financial holdings) which render it better able to monitor an attorney's prosecution of a securities class action.[32] And, it may well be that some members of Congress hoped that, with the help of the PSLRA, institutional investors would come to so dominate securities fraud class actions that they eventually *would* monopolize the lead plaintiff role. Regardless of the wisdom of such a policy, however, that policy is not expressly stated in the PSLRA. Indeed, the PSLRA never mentions the term "institutional investor." Accordingly, while the Court will accept the contention that a congressional preference for institutional investors underlies the PSLRA, the Court cannot accept the suggestion that that preference requires, or even encourages, the Court to disregard the *expressly stated* limitations in the statute itself.

It is worth noting, moreover, that the legislative history and academic material cited in that legislative history, see, e.g., Weiss & Beckerman, 104 Yale L.J.2053 (1995), are based on the theoretical assumption (and empirical reality)[33] that, generally speaking, the institutional investor will have suffered the greatest financial loss; and, because it suffered the greatest financial loss, the institutional investor will be the presumptively most adequate plaintiff. The institutional investor is not presumptively the most adequate plaintiff solely by virtue of its status as an institu-

members of both houses to vote in favor of the law.

**31.** This, in turn, would create other interpretative difficulties. For instance, it would provide no guidance to the court confronted with two parties seeking appointment as lead plaintiff, both of whom are institutional investors and both of whom served as lead plaintiff in five securities class actions in a three year period.

**32.** *See, e.g.,* Weiss, *Comment, 39* Ariz.L.Rev. at 563 ("[P]laintiffs' attorneys, if they had to be retained by institutional clients in order to become lead counsel in securities class actions, would be likely to become considerably more concerned with developing 'reputations as effective advocates of investors' interests.") (internal citation omitted).

**33.** *See* Weiss & Beckerman, 104 Yale L.Rev. at 2088–94 (collecting data on institutional investors' share of losses).

tional investor, however. If that were the case, Congress would have simply provided that *institutional investors* are presumptively the most adequate plaintiffs, regardless of the size of financial loss, and saved the Court from the need to engage in the very analysis it undertakes here. Instead, Congress chose to use the size of financial loss as the initial proxy for determining whether a particular plaintiff would be the "most adequate plaintiff." Accordingly, the Court concludes that an exemption from the presumptive bar of § 78u–4(a)(3)(vi) for institutional investors solely on account of their status is not supported by the language of the statute, or by its purposes and underlying theoretical premise. The Court, thus, declines to carve out the broad exemption urged by the FSBA.

This is not to say, however, that a person's status as an institutional investor should not *be taken into account* at all. Clearly, it should be considered in determining whether to excuse compliance with the rule; it simply should not be the dispositive factor. If, for instance, the Court were forced to choose between an institutional investor that had exceeded the five actions in three years rule and a single investor whose loss was dwarfed by that institutional investor, or a group of *unrelated* investors, then it certainly would be consistent with the purposes of the PSLRA to allow the institutional investor to serve as lead plaintiff, finding that the presumption arising under § 78u4(a)(3)(vi) had been adequately rebutted.

In other instances, like those presented here, however, excusing an institutional investor from the operation of § 78u–4(a)(3)(vi) would be inconsistent with the PSLRA's purposes. For example, an institutional investor that is *simultaneously* involved in one or more other securities class actions would have fewer resources available and be less able to police its

attorney's conduct. A lessened ability to monitor the conduct of its attorneys also could be revealed by the number of actions in which it is currently *seeking* appointment as lead plaintiff.[34] In either of these situations, lifting the bar would be inconsistent with the PSLRA's purpose of increasing the likelihood that the lead plaintiff will effectively monitor its counsel and actively participate in the litigation.

The FSBA is *currently* serving as lead plaintiff in at least one other securities class action, is *simultaneously seeking* appointment in other actions, and is also prosecuting several securities fraud cases *individually*. Moreover, as discussed below, the Hayman Group suffered substantial financial losses—indeed, the largest financial loss when compared to the $428,000 figure the Court has determined applies to the FSBA—and satisfies all of the other criteria of the PSLRA. Consequently, the FSBA is not a *relatively* more suitable lead plaintiff than the Hayman Group, and the FSBA's capability to serve as an effective monitor is, thus, subject to question. At the very least, it is not clear that allowing it to serve as lead plaintiff in such circumstances would be consistent with the purposes of the PSLRA.

Accordingly, the FSBA cannot serve as lead plaintiff for two independent reasons. First, it did not suffer the greatest financial loss, because its losses must be determined on the basis of its filings within the time frame dictated by § 78u–4(a)(3)(A)(i). Second, even if the greater loss figure were employed, the FSBA is presumptively barred from serving as lead plaintiff in this action by operation of § 78u–4(a)(3)(vi), and the FSBA has not demonstrated to the satisfaction of the Court that the presumptive bar should be lifted.

**34.** While, as noted earlier, it is the actual number of actions in which the institutional investor has or is serving as lead plaintiff that is relevant for purposes of determining whether the rule applies, the number of actions in which the institutional investor is seeking appointment as lead plaintiff may be relevant for determining whether to lift the bar.

### 3. The Hayman Group

The Court must next determine whether the Hayman Group, as lead plaintiff, will satisfy the dictates of the PSLRA and will be consistent with its purposes. It will.

First, though there has been some argument on this point, the Hayman Group satisfied the certification requirements of the PSLRA contained in § 78u–4(a)(2)(A). William and Arthur Hayman have both certified, in writing: (1) that they have reviewed the complaint and authorized its filing; (2) that they did not purchase shares at the direction of counsel or in order to participate in a securities action; (3) that they are willing to serve in a representative capacity; (4) that they have not sought to serve nor served as lead plaintiff in the past three years; and (5) that they have not and will not accept payment for serving as a representative party. The certification also sets forth all transactions in Telxon stock by the Haymans.

Second, the motion for lead plaintiff was timely filed, as required in § 78u–4(a)(3)(A). The motion was filed within sixty (60) days of the notice published on December 11, 1998. Indeed, it was filed on February 9, 1999, the same date as the FSBA's and Alsin Group's motions.

Third, the Hayman Group, *sans* Elkman, suffered the greatest financial loss and is, therefore, the presumptively most adequate plaintiff. As an initial matter, it is clear, under the Court's prior analysis, that the Hayman brothers appropriately can be considered a "group" under the PSLRA. As brothers, the Haymans obviously have a pre-existing relationship and a basis for acting as a collective unit.[35] Consequently, they will be able to speak with a single voice in their dealings with their chosen counsel. Moreover, because of their relationship, the Hayman's losses may properly be aggregated for purposes of determining financial loss, a loss which totals $1,087,967.00. There is no basis, however, for including Elkman as a member of this group.[36] He has no pre-existing relationship or association with the Hayman brothers. Thus, just as the lack of any relationship among *any* of the members of the proposed Alsin Group prevented their inclusion in a group under the PSLRA, the lack of a relationship between Elkman and the Haymans bars his inclusion in the Hayman Group for purposes of aggregating losses.

The Hayman Group's asserted loss of $1,087,967 is clearly larger than the $428,-000 loss of the FSBA. Regardless of the FSBA's loss, moreover, the FSBA is disqualified from serving as lead plaintiff in this action. Thus, the Hayman Group's loss trumps that of the FSBA. In addition, because the Alsin Group may not aggregate its losses, the Hayman Group's loss need not be compared against the loss claimed by the Alsin Group. The Hayman Group's loss is, moreover, the kind of loss

---

**35.** It is merely coincidence that the Haymans are *literally* related. The Court does not mean to imply that a familial relationship or other such bond is necessary for purposes of determining whether a group forms a cohesive unit. A number of other bonds or preexisting relationships could satisfy this requirement as well.

**36.** Though the reasons behind Elkman's proposed membership in the group are not entirely clear, it appears that he was included because he purchased shares earlier than the Haymans and, thus, the addition of his losses would serve to create a larger class period, encompassing the period initially asserted by all of the proposed lead plaintiffs in this ac-

tion. This was perhaps an attempt to foreclose any argument that the Haymans' more restricted loss period renders its claims atypical. There has been no suggestion in this case, however, that the claims of investors who held shares in one time period as to which Telxon's income had been misstated differ substantially from those who held shares during any other time period subject to a restatement. The Court, accordingly, finds that the Haymans' claims are sufficiently typical of those of all putative class members to satisfy the prerequisites of Rule 23 of the Federal Rules of Civil Procedure, and the dictates of the PSLRA.

that would help assure that this putative lead plaintiff will serve as an effective monitor of counsel's actions and is not merely a "professional plaintiff." [37] Accordingly, the Hayman Group suffered the greatest financial loss as compared with the other competing persons or groups of persons seeking appointment as lead plaintiff.

The Hayman Group also satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure for those seeking to be a representative plaintiff, as required under 78u–4(a)(3)(B)(iii). The claims of the Hayman Group are typical of the claims of the other plaintiffs; all claims are based on the same types of alleged misrepresentations and omissions. There also has been no suggestion that the Hayman Group will not fairly and adequately protect the interests of the class. Finally, there has been no serious argument that the Hayman Group does not otherwise satisfy the requirements of Rule 23. The Hayman Group is, thus, the presumptively most adequate plaintiff.

Finally, the other would-be lead plaintiffs have not pointed to anything that would effectively rebut the Hayman's entitlement to lead plaintiff status. As stated above, there is no proof that the Hayman Group will not fairly and adequately protect the interests of the class, or that it is subject to unique defenses to which the other plaintiffs are not susceptible. Accordingly, the Hayman Group is hereby appointed lead plaintiff in this action.

Pursuant to 15 U.S.C. § 78u–4(a)(3)(v),[38] the Hayman Group's choice of lead counsel, the law firm of Zwerling, Schachter & Zwerling, LLP, is approved. The Hayman's choice of liaison counsel, Duvin, Cahn & Hutton, P.A., also is approved. Both appear to have the requisite ability and expertise to prosecute and manage this litigation effectively.

### III. Conclusion

The motion to consolidate is **GRANTED.** The following actions are consolidated and all subsequent papers, pleadings, and motions shall be filed under the case number of the lowest-numbered case, *Bragdon, et al. v. Telxon Corp., et al.,* 5:98–CV–2876, **which will be re-captioned as** *In re Telxon Corporation Securities Litigation,* Case No. 5:98–CV–2876:

*Bragdon, et al. v. Telxon Corp., et al.,* 5:98cv2876

*Park East, Inc., et al. v. Telxon Corp., et al.,* 5:98cv2880

*Frankfort, et al. v. Telxon Corp., et al.,* 5:98cv2888

*Strachan, et al. v. Telxon Corp., et al.,* 5:98cv2890

*Fine, et al. v. Telxon Corp., et al.,* 5:98cv2891

*Palumbo, et al. v. Telxon Corp., et al.,* 5:98cv2892

*Silverman, et al. v. Telxon Corp., et al.,* 5:98cv2893

*Leviticus Partners, et al. v. Telxon Corp., et al.,* 5:98cv2916

*Haff v. Telxon Corp., et al.,* 5:98cv2917

*Gottesman, et al. v. Telxon Corp., et al.,* 5:98cv2918

*Wechsler, et al. v. Telxon Corp., et al.,* 5:98cv2929

*Moss, et al. v. Telxon Corp., et al.,* 5:98cv2930

*Lewitter, et al. v. Telxon Corp., et al.,* 5:98cv2943

*Freitag, et al. v. Brick, et al.,* 5:98cv2944

*Knowlton, et al. v. Telxon Corp., et al.,* 5:98cv2962

*Esrati, et al. v. Telxon Corp., et al.,* 5:98cv3002

**37.** If the figure were nominal, then the Court might be forced to reopen applications for lead plaintiff to others.

**38.** 15 U.S.C. § 78u–4(a)(3)(vi) provides:

**(v) Selection of lead counsel**
   The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.

*Scalisi, et al. v. Telxon Corp., et al.,* 5:98cv3031

*Kraus, et al. v. Telxon Corp., et al.,* 5:99cv0009

*Stansburg, et al. v. Telxon Corp., et al.,* 5:99cv0031

*Sprenger, et al. v. Telxon Corp., et al.,* 5:99cv0032

*Budroe, et al. v. Telxon Corp., et al.,* 5:99cv0046

*Stevenor, et al. v. Telxon Corp., et al.,* 5:99cv0071

*Buettler, et al. v. Telxon Corp., et al.,* 99cv0120

*Burkhalter v. Telxon Corp.,* 5:99cv192

*Lincoln Holdings, Inc., et al. v. Telxon Corp.,* 5:99cv211

*Salerno v. Telxon Corp.,* 5:99cv231

*FSBA v. Brick, et al.,* 5:99cv0561

An amended complaint encompassing all claims of all plaintiffs reflected in all of the pending actions shall be filed by the lead plaintiff no later than **September 30, 1999.** This action is hereby assigned to the complex track. A status conference will be conducted in this consolidated action on **October 26, 1999, at 1:30 p.m.** Orders dismissing case nos. 5:98cv2880 through 5:99cv0561 without prejudice will be issued separately by the Court.

The motion of the Hayman Group, consisting of William and Arthur Hayman, for appointment as lead plaintiff is **GRANTED,** and it is hereby appointed lead plaintiff in this consolidated action. In addition, its selection of counsel is approved. The motions of the Alsin Group and FSBA for appointment of lead plaintiff and approval of lead counsel are hereby **DENIED.** Any and all other pending motions are **DENIED as moot.**

**IT IS SO ORDERED.**