Raymond **FERRARI**, on behalf of himself and all others similarly situated, Plaintiff,

v.

Joseph P. **GISCH** et al., Defendants.

No. CV 037063NM (SHx).

United States District Court, C.D. California.

May 21, 2004.

Andrew L. Zivitz, Gregory M. Castaldo, Marc A. Topaz, Sean M. Handler, Schiffrin and Barroway, Bala Cynwyd, PA, Christopher Kim, Lisa J. Yang, Lorinda D. Franco, Lim, Ruger & Kim, Jonathan E. Behar, Lerach, Coughlin, Stoia, Geller, Rudman and Robbins, Los Angeles, CA, Darren J. Robbins, Lerach, Coughlin, Stoia, Geller, Rudman and Robbins, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, David A. Rosenfeld, Samuel H. Rudman, Cauley, Geller, Bowman, Coates & Rudman, Melville, NY, for Plaintiff.

Christopher H. McGrath, Colleen Elizabeth Huschke, Paul, Hastings, Janofsky & Walker, San Diego, CA, Jay C. Gandhi, Peter M. Stone, Paul, Hastings, Janofsky & Walker, Costa Mesa, CA, Jeffrey A. Richmond, Jerry L. Marks, Paul B. Foust, Heller, Ehrman, White and McAuliffe, Harry A. Olivar, Jr., Quinn, Emanuel, Urquhart, Oliver & Hedges, Los Angeles, CA, Bonnie Schroeder McGuire, Christopher R. Dillon, John D. Donovan, Jr., Ropes and Gray, Boston, MA, for Defendants.

ORDER: (1) APPOINTING THE POPPE GROUP LEAD PLAINTIFFS AND APPROVING SELECTION OF LEAD COUNSEL AND (2) DENYING THE MASSACHUSETTS GROUP'S MOTION TO PRESERVE RELEVANT EVIDENCE

MANELLA, District Judge.

## I. INTRODUCTION

This is a securities fraud action brought pursuant to the Securities Exchange Act of 1934 and the Private Securities Litigation Reform Act of 1995 ("PSLRA" or the "Reform Act"). On December 16, 2003, four groups of plaintiffs stipulated, with the court's approval, to consolidate their actions against Joseph P. Gisch, Bruce D. McMaster, Charles Dimick, Gregory Halvorson, and John Peters (collectively "Defendants").[1] Four groups have moved for appointment as lead plaintiffs and for approval of their counsel as lead counsel:

(1) On December 2, 2003, the Massachusetts State Carpenters Pension Fund and the City of Harper Woods Employees Retirement System (collectively the "Massachusetts Group") moved for appointment as lead plaintiffs to be represented by Milberg Weiss Bershad Hynes & Lerach LLP.

(2) On December 1, 2003, the Municipal Employees' Retirement System of Louisiana ("MERSL") moved for appointment as lead plaintiff to be represented by Berstein Litowitz Berger & Grossman.

(3) On December 1, 2003, Plaintiffs Paul Poppe, LeRoy Schneider, and Rand Skolmick (collectively the "Poppe Group") moved for appointment of lead plaintiffs to be represented by Schiffrin & Barroway, LLP and for the appointment of Lim, Ruger & Kim, LLP as liaison counsel.

(4) On February 9, 2004, after the filing deadline, the Poppe Group and MERSL jointly moved for appointment as lead plaintiffs with their counsel Schiffrin & Barroway, LLP and Bernstein Litowitz Berger & Grossman LLP.

The Massachusetts Group also seeks an order preserving relevant documents and evidence.

## II. FACTUAL BACKGROUND [2]

DDi Corporation ("DDi") provides technologically advanced, time-critical electronics engineering, development and manufacturing services to original equipment manufacturers and other providers of electronics manufacturing services. Compl. ¶ 2. The proposed plaintiff class consists of purchasers of publicly traded DDi securities between December 19, 2000 and April 29, 2002. *Id.* ¶ 1. Defendants include certain DDi officers and directors whom plaintiffs allege violated the Securities Exchange Act of 1934 (the "Act"). *Id.*[3] Specifically, plaintiffs assert that, during the class period, Defendants knew that DDi was in serious financial trouble, but concealed that fact from the investing public. *Id.* ¶¶ 3, 18–38. They point to a series of statements made by Defendants during the class period that they contend were false and misleading, including various press releases heralding the strength of the company. *Id.* ¶¶ 18–28.[4] Plaintiffs allege that by making

---

1. The cases consolidated were *Ferrari v. Gisch et al.*, Case No. CV 03–07063, *Sunderland v. Gisch et al.*, Case No. CV 03–7883, *Rodewald v. Gisch et al.*, Case No. CV 03–7999, and *Sved v. Gisch et al.*, Case No. CV 03–8344.

2. This summary is based on allegations in the first-filed complaint, which are representative of the allegations made by all plaintiff groups.

3. DDi is not named as a defendant because it has sought protection under the United States bankruptcy laws. *Id.* ¶ 8.

4. Plaintiffs contend the statements were "group-published" through the collective action of Defendants. *Id.* ¶ 14.

these statements and failing to disclose adverse facts regarding DDi, Defendants artificially inflated the prices of DDi's publicly traded securities, increasing to as high as $35.50 per share on January 30, 2001, and sold in excess of $20 million in DDi stock at the inflated prices during the class period. *Id.* ¶ 4. Once the truth was revealed about DDi's dismal financial condition, the stock plummeted and the company eventually filed for bankruptcy, causing investors to lose hundreds of millions of dollars. *See id.* ¶¶ 8, 42–43.

Plaintiffs plead claims for violation of § 10(b) of the Act and Securities and Exchange Commission Rule 10b–5. *Id.* ¶¶ 39–43. They also assert claims under § 20(a) of the Act. *Id.* ¶¶ 44–45.

### III. *DISCUSSION*

#### A. Appointment of Lead Plaintiffs

##### 1. *The Appropriate Legal Standard*

The Reform Act provides that within 20 days after the date on which a securities class action complaint is filed,

> the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class-
>
> (I) of the pendency of the action, the claims asserted therein, and the purported class period; and
>
> (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

*See* 15 U.S.C. § 78u–4(a)(3)(A)(i). Any class member, regardless of whether he has filed a complaint, may move for appointment as lead plaintiff. 15 U.S.C. § 78u–4(a)(3)(B)(i).

If more than one action is filed, only the plaintiff or plaintiffs in first-filed action are required to publish notice. *See* 15 U.S.C. § 78u(4)(a)(3)(A)(ii). The Reform Act requires that within 90 days of the published notice,

> the court ... shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately represent-

ing the interests of class members (hereafter ... referred to as the "most adequate plaintiff") ....

15 U.S.C. § 78u–4(a)(3)(B)(i).

> In selecting a lead plaintiff,
>
> the court shall adopt a presumption that the most adequate plaintiff in any private action ... is the person or group of persons that—(aa) has either filed the complaint or made a motion [for designation as lead plaintiff]; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

> This presumption may be rebutted
>
> only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—
>
> (aa) will not fairly and adequately protect the interests of the class; ·or
>
> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

In interpreting these statutes, the Ninth Circuit has stated that the Reform Act "provides a simple three-step process for identifying the lead plaintiff" in a securities fraud case. *In re Cavanaugh,* 306 F.3d 726, 729 (9th Cir.2002). "The first step consists of publicizing the pendency of the action, the claims made and the purported class period." *Id.* In the second step, "the district court must consider the losses allegedly suffered by the various plaintiffs" before selecting a "presumptively most adequate plaintiff." *Id.* at 729–30. At this stage, the court must view "the one who 'has the largest financial interest in the relief sought by the class' and [who] 'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure'" as the "presumptive lead plaintiff." *Id.* At the third step of the process, the court must "give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements." *Id.* at 730.

In *Cavanaugh*, the court cautioned that "a straightforward application of the statutory scheme ... provides no occasion for comparing plaintiffs with each other on any basis other than their financial stake in the case.... So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job." *Id.* at 732. With these principles in mind, the court evaluates each of the groups that seeks appointment as lead plaintiffs in this action.

### 2. Publication and Lead Plaintiff Motions

On October 1, 2003, the law firm of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") filed an action against Defendants on behalf of plaintiff Raymond Ferrari. That same day, the firm caused notice to be published over Business Wire, a national business-oriented wire service. Behar Decl., Ex. E. The notice advised class members of the filing of the Ferrari action and of the class period alleged. *Id.* It stated that if class members wished to serve as lead plaintiff, they were required to move for appointment within sixty days of the date of the notice. *Id.; see* 15 U.S.C. § 78u–4(a)(3)(A)(i)(II) (stating that within "60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff").

Thereafter, motions by the Massachusetts Group, the Poppe Group, and MERSL were filed requesting designation as lead plaintiffs and the appointment of lead counsel. On February 9, 2004, the Poppe Group and MERSL submitted a joint memorandum in support of their motions and in opposition to the Massachusetts Group's motion. They asserted that "after filing their original papers to be appointed lead plaintiff, [m]ovants determined that it would be in the best interests of the Class to join together to continue the efficient prosecution of this action." Joint Mem., p. 2. They noted, however, that "none of the [m]ovants intend[s] to withdraw their prior motions for appointment as Lead Plaintiff or selection of Lead Counsel. Thus, should the Court determine to deny this application, [m]ovants respectfully request that the Court appoint either movants Poppe, Schneider and Skolmick, or movant MERSL

as Lead Plaintiff in this Action[.]" *Id.* at 2, n. 2.

■ The court construes the joint memorandum of the Poppe Group and MERSL as a motion for appointment as lead plaintiffs. So construed, it is untimely. It was filed after each party filed separate motions for appointment as lead plaintiff and over a year after the filing deadline. The Reform Act requires that any member of the purported class who wishes to serve as lead plaintiff move for appointment "not later than 60 days after the date on which the notice is published." 15 U.S.C. § 78u–4(a)(3)(A)(i)(II).

In *In re Telxon Corp. Sec. Litig.*, 67 F.Supp.2d 803 (N.D.Ohio 1999), a corporate defendant restated its earnings a second time after various plaintiffs had filed motions for appointment as lead plaintiffs. Following the restatement, one of the plaintiff groups vying for appointment as lead plaintiffs filed a complaint, expanding the class period and adding losses allegedly suffered during the period covered by the second restatement. *Id.* at 806. In evaluating which plaintiff group had the largest losses, the court concluded that only the group's motion for appointment, filed prior to the expiration of the 60–day statutory period, could be considered. It declined to consider the larger losses alleged in the post-restatement complaint. Noting the "strict time requirements" of the Reform Act, the court stated:

> The [Reform Act] is unequivocal and allows for no exceptions. All motions for lead plaintiff must be filed within sixty (60) days of the published notice for the first-filed action. The plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has closed .... The obvious intent of these provisions is to ensure that the lead plaintiff is appointed at the earliest possible time, and to expedite the lead plaintiff process.

*Id.* at 818–19 (emphasis in original).

The court noted that considering a complaint filed after the 60–day period had closed would encourage parties seeking lead plaintiff status to "manipulate the size of

their financial loss by enlarging the class period or adding additional persons to a 'group' in supplemental filings .... [which] would invite additional briefing .... effectively render[ing] the strict timeliness set forth in the [Reform Act] meaningless." *Id.* at 819; *see also Netsky v. Capstead Mortgage Corp.,* 2000 WL 964935, *3 (N.D.Tex. Jul.12, 2000) (joint motion untimely where plaintiffs filed joint motion nearly three months after deadline).

In this case, Milberg Weiss gave notice to class members on October 1, 2003. Behar Decl., Ex. E. The 60–day period expired on December 1, 2003. Because February 9, 2004—the date on which the Poppe Group and MERSL filed their joint memorandum—is over a year past the deadline, well beyond the 60–day period mandated by the Act, the court declines to consider their joint motion for appointment of lead plaintiffs. The court will determine the presumptively most adequate plaintiff from the remaining three groups of plaintiffs.

### B. The Presumptive Lead Plaintiff

In *Cavanaugh,* the Ninth Circuit stated that the second step of the statutory process outlined in the Reform Act consisted of first determining the plaintiff with the greatest financial stake in the litigation and then focusing on whether that plaintiff satisfies the typicality and adequacy requirements of Federal Rule of Civil Procedure 23. 306 F.3d at 729–30. The court first assesses the party with the greatest financial interest in the instant action; it then evaluates that plaintiffs' showing with respect to the requirements of Rule 23. *Id.*

#### 1. Financial Stake

The Ninth Circuit has not set forth a mandatory formula to be used when calculating financial interest. *See Cavanaugh,* 306 F.3d at 730 n. 4 ("[T]he court may select accounting methods that are both rational and consistently applied"). In *In re Cendant Corp. Litig.,* 264 F.3d 201, 262 (3d Cir.2001), the court stated that "[t]he Reform Act provides no formula for courts to follow in making [the financial interest] assessment, but we agree

with the many district courts that have held that courts should consider, among other things: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs."

In the instant action, declarations submitted by the parties indicate that the Poppe Group purchased the largest number of shares during the class period. *See* Yang Decl., Ex. D (indicating that the Poppe Group collectively purchased 32,497 shares during the class period); *compare* Behar Decl., Ex. A (indicating that the Massachusetts Group purchased 25,977 shares); Delange Decl., Ex. C (indicating that MERSL purchased 15,400 shares).

The declarations also demonstrate that the Poppe Group suffered the greatest losses. The Poppe Group asserts that it has "sustained losses totaling approximately $253,213." Poppe Mot., p. 1; *see also* Declaration of Yang Decl., Ex. D (Chart of Movants' Transactions in DDi Securities) (indicating that the three investors constituting the group suffered a total loss of $253,213.62). In comparison, MERSL states that it is a "sophisticated institutional investor ... that suffered losses of more than $190,000" in the class period. MERSL Mem., p. 2; *see also* Delange Decl., Ex. C (Chart Outlining Loss Calculation in DDi Corp. from December 19, 2000 through April 29, 2002) (indicating that MERSL suffered a loss of $190,647.24). The Massachusetts Group alleges that it sustained losses of over $200,000. Massachusetts Group Mem., p. 2; *see also* Behar Decl., Exh. A (Chart of Movants' Purchases and Losses) (indicating losses of $201,146.69).[5]

In its opposition filed on February 9, 2004, the Massachusetts Group contends that the Poppe Group has falsely represented its losses. Specifically, the Massachusetts Group insists that the Poppe Group overstated the true amount of its stated losses "by using purchase prices that are higher than the

---

5. The Massachusetts Group also represents the loss as "in excess of $150,000." Massachusetts Group Reply, p. 14.

day's highest trading price and by failing to use an average share price to calculate LeRoy Schneider's post-Class Period sale." Massachusetts Group Opp., p. 8. It asserts that when appropriately adjusted, the Poppe Group' total losses are reduced "by more than $25,000 to approximately $226,000." *Id.* It further contends that the difference between the corrected $226,000 in losses asserted by the Poppe Group and the $200,000 in losses alleged by the Massachusetts Group is "de minimis and not determinative on the appointment of a lead plaintiff." *Id.*

■ In a joint reply to the Massachusetts Group's opposition, MERSL and the Poppe Group acknowledge that the losses sustained by the Poppe Group were not as large as those represented in the Poppe Group's initial motion. They claim that the miscalculations were inadvertent mistakes. *See* Joint Reply Mem., p. 4 ("While the Massachusetts Group points to a miscalculation of the losses [of the Poppe Group], these are merely inadvertent mistakes and in no way go to the adequacy of their representation"). The relatively minor miscalculations do not serve as a basis for disqualifying the Poppe Group. See *In re Advanced Tissue Sciences Sec. Litig.,* 184 F.R.D. 346, 351 n. 12 (S.D.Cal. 1998) ("The Court ... does not find the McKitty Group's computational and typographical errors to be so substantial as to overcome the statutory presumption in favor of the McKitty Group."); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 410–11 (D.Minn.1998) (allowing plaintiff movant to supplement certifications in order to correct technical deficiencies in original filing).

As both the Poppe Group and the Massachusetts Group note, however, even under the Massachusetts Group's calculations the Poppe Group has nevertheless established the largest financial interest in the litigation. When any alleged errors are rectified, the Poppe Group's losses total $226,000. *Id.; see also* Supp. Behar Decl., Ex. D. This amount still exceeds the $200,000 in losses proffered by the Massachusetts Group.

■ Although the Massachusetts Group concludes that the "de minimus" difference of $26,000 should not be conclusive on the financial interest determination, the Ninth Circuit has given no indication that courts are free to ignore the statutory presumption given to the plaintiff with the "largest financial interest in the relief sought by the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). To the contrary, it has instructed the lower courts to strictly adhere to the statutory process:

> Nor does the Reform Act authorize the district judge to examine the relative merits of plaintiffs seeking lead status on a round-robin basis. The statutory process is sequential: The court must examine potential lead plaintiffs one at a time, starting with the one who has the greatest financial interest, and continuing in descending order if and only if the presumptive lead plaintiff is found inadequate or atypical.

*Cavanaugh,* 306 F.3d at 732.

The cases the Massachusetts Group cites in support of its position do not persuade the court otherwise. In *In re Conseco, Inc. Sec. Litig.,* 120 F.Supp.2d 729 (S.D.Ind.2000), the court rejected three plaintiffs with financial interests higher than the lead plaintiffs selected by the court. In doing so, it made relative comparisons among the proposed lead plaintiffs on bases other than financial interest—precisely what the Ninth Circuit cautioned against in *Cavanaugh. See Conseco,* 120 F.Supp.2d at 733–34 (noting that "the Court is not confident in the Grieves Group as being the most adequate plaintiff .... Yevzeroff has not submitted the quality of information that would give this Court the confidence that as a sole individual investor, he is capable of adequately representing the purported class and controlling lead counsel.") *contra Cavanaugh,* 306 F.3d at 732 ("That the district court believes another plaintiff may be 'more typical' or 'more adequate' is of no consequence. So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job.")

In *Borenstein v. Finova Group,* 2000 U.S. Dist. LEXIS 14732, *24 (D.Ariz. Aug. 28, 2000), the court concluded that "the evidence regarding the relative financial interests of the movants [was] inconclusive." "Finding the plaintiffs' relative financial interests in-

conclusive, and perhaps indeterminable, the Court [ ] turn[ed] to the third element of the presumption: the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* In the present case, however, the evidence before the court is not inconclusive; it clearly favors the Poppe Group over the Massachusetts Group. The Massachusetts Group concedes that even were the court to apply the calculation it proffers, the Poppe Group would still have the greatest financial interest in the litigation. *See* Massachusetts Group Opp., p. 8; *see also id.,* p. 2 (asserting that the Massachusetts Group "has suffered greater losses than any other *institutional investor movant*") (emphasis added). Because this is the barometer established by the Reform Act and the Ninth Circuit's interpretation of the statutory scheme, the court declines the Massachusetts Group's invitation to award it, and not the Poppe Group, the presumption of most adequate plaintiff.

### 2. Typicality and Adequacy Under Rule 23

In *Cavanaugh,* the Ninth Circuit stated that once the court has determined the plaintiff with the greatest financial stake in the lawsuit, it "must then focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" 306 F.3d at 730 (emphasis in original). At this stage, the court "must rely on the presumptive lead plaintiff's complaint and sworn certification; there is no adversary process to test the substance of those claims." *Id.* A wide ranging analysis "is not appropriate [at the initial stage of the litigation] and should be left for consideration of a motion for class certification." *Fischler v. AmSouth Bancorp.,* 1997 WL 118429, *2 (M.D.Fla. Feb.6, 1997). As noted by the Third Circuit in *Cendant,* "institutional investors and others with large losses will, more often than not, satisfy the typicality and adequacy requirements." 264 F.3d at 264.

#### (i) Typicality

■ "The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the [Lead Plaintiffs] have incentives that align with those of absent class members so ... that the absentees' interests will be fairly represented." *Baby Neal v. Casey,* 43 F.3d 48, 57 (3d Cir.1994) (citation omitted). "Under [Rule 23's] permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998). "Typicality entails an inquiry whether the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Baby Neal,* 43 F.3d at 57–58 (internal quotation marks and citations omitted); *Patrykus v. Gomilla,* 121 F.R.D. 357, 362 (N.D.Ill.1988) (a "representative's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and ... is based on the same legal theory") (internal quotation marks and citation omitted). All that is required at this stage of litigation is a preliminary showing of typicality and adequacy. *Erikson v. Cornerstone Propane Partners LP,* 2003 WL 22232387, *3 (N.D.Cal. Sept.15, 2003).

■ The Poppe Group's claims are based on their purchase and sale of DDi stock during the class period, allegedly in reliance on the Defendants' misrepresentations. *See* Poppe Group Mot., pp. 3–4. The Poppe Group contends that they satisfy the typicality requirement because, like the remaining class members, they: (1) purchased or acquired DDi securities during the Class Period; (2) at prices allegedly artificially inflated by Defendants' materially false and misleading statements and/or omissions; and (3) suffered damages. *Id.* at 9; *see also* Joint Poppe Decl. ¶ 1, Yang Decl., Ex. B (stating "each member of the [Poppe Group] purchased DDi Corporation, ('DDi') securities during the Class Period, and suffered substantial losses as a result").

The typicality requirement is thus satisfied because their claims arise "from the same event or practice or course of conduct that gives rise to the claims of the class members" and are "based on the same legal theo-

ry." *See Baby Neal,* 43 F.3d at 58. Because a "preliminary showing" is all that is necessary, and because the Poppe Group has submitted sworn certifications and declarations indicating that they purchased securities during the relevant class period and suffered losses as a result, the court concludes that it has satisfied the burden of establishing typicality. *See Cendant,* 264 F.3d at 265; *Erikson,* 2003 WL 22232387, *3.

### (ii) *Adequacy*

■ Rule 23(a) also requires that the person(s) representing the class be able "fairly and adequately protect the interests" of all members in the class. Fed.R.Civ.P. 23(a)(4). Whether the class representative will adequately represent the class depends on the circumstances of each case. *McGowan v. Faulkner Concrete Pipe Co.,* 659 F.2d 554, 559 (5th Cir.1981). The Ninth Circuit has held that representation is "adequate" when the representative's interests are not antagonistic to the interests of absent class members, it is unlikely that the action is collusive, and counsel for the class is qualified and competent. *In re Northern Dist. of Cal., Dalkon Shield IUD Prod. Liab. Litig.,* 693 F.2d 847, 855 (9th Cir.1982). In addition, the class representative must have a sufficient interest in the outcome of the case to ensure vigorous advocacy. *See Riordan v. Smith Barney,* 113 F.R.D. 60, 64 (N.D.Ill.1986). "Adequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff[s] to vigorously prosecute the action." *In re Milestone Scientific Sec. Lit.,* 183 F.R.D. 404, 416 (D.N.J.1998).

■ In the instant case, the Poppe Group has suffered the greatest financial loss, providing an incentive to prosecute the case vigorously. Moreover, there is no evidence of conflict between the group and the remaining class members, nor is there any indication of collusive action. Each plaintiff in the Poppe Group has submitted a certification stating that he or she "is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary." Certification ¶ 3, Yang Decl., Ex. A. The plaintiffs have also submitted a joint declaration, which states in relevant part:

> The [Poppe Group] understands that each of its members could have sought lead plaintiff status either individually or together with others, or could have taken no action and remained an absent class member. We endeavor to continue to provide fair and adequate representation and to continue to work together and with counsel to obtain the largest recovery for the class consistent with good faith and sound judgment.

Joint Poppe Decl., Yang Decl., Ex. B.

The declaration further provides that the Poppe Group has implemented procedures to ensure efficient prosecution of the action, including scheduling meetings to discuss the actions, receiving of all relevant filings with the court, and providing a mechanism to resolve disputes. *Id.*

In *Cendant,* the Third Circuit noted that "one of the best ways for a court to ensure that it will fairly and adequately represent the interests of the class is to inquire whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel[.]" 264 F.3d at 265. The question at this stage of the process is not whether "the court would 'approve' that movant's choice of counsel"; instead, it is whether "the choices made by the movant with the largest losses are so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all." *Id.* at 266.

In the instant case, the Poppe Group has selected Schiffrin & Barroway, LLP as lead counsel. A review of the firm's biography indicates that it has experience in litigating securities class actions and will be able to prosecute the class interests adequately. *Cf. Cavanaugh,* 306 F.3d at 733 (noting that lead counsel information is relevant to the adequacy evaluation "only to determine whether the presumptive lead plaintiff's choice of counsel is so irrational, or so tainted by self-dealing or conflict of interest, as to cast genuine and serious doubt on that plaintiff's

willingness or ability to perform the functions of lead plaintiff").

In its opposition to the Poppe Group's request for appointment as lead plaintiff, the Massachusetts Group contends that the Poppe Group cannot demonstrate its adequacy because it is not an institutional investor. *See* Massachusetts Group Opp., p. 6 ("[The Massachusetts Group represents] precisely the type of institutional investors experienced in the securities market that Congress sought to have control this type of litigation. The Poppe Group, on the other hand, consists of three private individual investors who have presented no evidence that they possess the sophistication, expertise and resources to manage the litigation effectively.").

The Third Circuit has noted that such a factor may be relevant to the adequacy inquiry. *See Cendant*, 264 F.3d at 266 (noting that "[t]he second additional factor that the court should consider in making the threshold adequacy determination will arise only when the movant with the largest interest in the relief sought by the class is a group rather than an individual person or entity"). Here, the Poppe Group appears to consist of previously unrelated investors who have in common their selection of lead counsel.

There is no doubt that in enacting the PSLRA, Congress wished to ensure that investors, rather than lawyers, would control securities litigation. *See, e.g., In re Network Assocs., Inc. Sec. Litig.*, 76 F.Supp.2d 1017, 1020 (N.D.Cal.1999). Some courts have held that appointment of a group of "unrelated" investors would violate the purpose of the act. *See, e.g., In re Telxon Corp. Sec. Litig.*, 67 F.Supp.2d 803, 813 (N.D.Ohio 1999); *In re Baan Co. Sec. Litig.*, 186 F.R.D. 214, 217 (D.D.C.1999); *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y.1997). The majority of courts addressing the issue, however, have not utilized such an approach. *See, e.g., Cendant*, 264 F.3d at 266 ("we disagree with those courts that have held that the statute invariably precludes a group of 'unrelated individuals' from serving as a lead plaintiff"); *Yousefi v. Lockheed Martin Corp.*, 70 F.Supp.2d 1061, 1068 (C.D.Cal. 1999) (declining to aggregate 137 plaintiffs, but appointing three plaintiffs to serve as a lead plaintiff group); *Takeda v. Turbodyne Techs., Inc.*, 67 F.Supp.2d 1129, 1135–36 (C.D.Cal.1999) (appointing seven class members as lead plaintiffs); *see generally Cavanaugh*, 306 F.3d 726 (citing approvingly to *Cendant*). Examining the tension between Congress' intention to return control of securities litigation to investor-plaintiffs and the language of its enactment, which contemplates the appointment of a "group" of plaintiffs, the *Yousefi* court noted:

> Although the legislative history stresses the need to place control of securities class actions in a small and finite number of plaintiffs, the statute's language explicitly provides for more than one lead plaintiff, altogether failing to limit the number of lead plaintiffs a court may employ. This tension's import is that Congress desired the Act to mitigate abusive litigation tactics, in contrast to serving as an antidotal measure. Examining the Act through this palliative lense, the Court finds that it contemplates the aggregation of unrelated plaintiffs as a permissible, albeit suboptimal, result.

*Yousefi*, 70 F.Supp.2d at 1068 (internal citations omitted).

Since the statute expressly authorizes the appointment of a "group" of persons to serve as Lead Plaintiffs, the key question is whether the proposed plaintiff group can effectively manage the litigation and direct lead counsel. In this regard, the court notes the SEC's position that any group of lead plaintiffs appointed should have sophistication, expertise, and resources equivalent to those of an institutional investor. *See In re Network Associates*, 76 F.Supp.2d at 1025. Moreover, any group appointed must be sufficiently small that it can engage in coordinated decision-making. *See, e.g., In re Advanced Tissue*, 184 F.R.D. at 352–53 (appointing six of a proposed group of 250 as lead plaintiffs); *Chill*, 181 F.R.D. at 408–09 (winnowing the proposed plaintiff group of almost 300 to six); *see also In re Baan*, 186 F.R.D. at 224 (the SEC states in its memorandum that "a court generally should only approve a group that is small enough to be capable of effectively managing the litigation and the lawyers"); *Gluck v. CellStar Corp.*, 976 F.Supp. 542, 549 (N.D.Tex.1997) ("Increasing the number of Lead Plaintiffs [will] detract from the Re-

form Act's fundamental goal of client control, as it [will] inevitably delegate more control and responsibility to the lawyers for the class and make the class representatives more reliant on the lawyers.").

Here, the appointment of the Poppe Group satisfies the purposes of the Reform Act. The Poppe Group consists of only three lead plaintiffs, which is a manageable number. Although neither the motions nor declarations expressly discuss the sophistication of the Poppe Group's members, the court notes that two of the three made substantial purchases of DDi stock. Yang Decl., Ex. A (Poppe purchased 20,000 shares, Schneider purchased 11,600 shares, and Skolmick purchased 897 shares). The court concludes that investors making such substantial securities decisions would likely have the sophistication necessary to serve as lead plaintiffs in a securities class action. *See Lax v. First Merch. Acceptance Corp.*, 1997 WL 461036, *5 n. 10 (N.D.Ill. Aug.11, 1997). As a result, the court finds that the Poppe Group has demonstrated adequacy pursuant to Rule 23.

### (iii) *The Poppe Group is the Presumptive Lead Plaintiff*

It is undisputed that the Poppe Group suffered the greatest financial loss as a result of the alleged misrepresentations made by Defendants. The certifications and declarations submitted establish that the Poppe Group has met the requirements, at this preliminary stage, of typicality and adequacy under Rule 23. *See Cavanaugh*, 306 F.3d at 730 (noting the court's required reliance, in step two of the process, "on the presumptive lead plaintiff's complaint and sworn certification"). As a result of the preceding analysis, the court finds that the Poppe Group is presumptively the most adequate lead plaintiff in this matter. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

### 3. *The Presumption Has Not Been Rebutted*

Pursuant to the Reform Act, the statutory presumption in favor of the most adequate plaintiff can be rebutted in two ways. As provided in the statute,

> The presumption ... may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff-

> (aa) will not fairly and adequately protect the interests of the class; or

> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(II); *see also Advanced Tissue Sciences*, 184 F.R.D. at 350–51. As noted in *Cendant*, "once the presumption is triggered, the question *is not* whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a fair and adequate job." 264 F.3d at 267 (internal quotations omitted) (emphasis in original). This inquiry *"is not* a relative one." *Id.* (emphasis in original); *see also Cavanaugh*, 306 F.3d at 730 ("At the third stage, the process turns adversarial and other plaintiffs may present evidence that disputes the lead plaintiff's prima facie showing of typicality and adequacy").

In this case, because MERSL and the Poppe Group eventually endeavored to join forces, only the Massachusetts Group disputes the presumptive adequacy of the Poppe Group. The Massachusetts Group's briefing, however, appeals to the court for a relative comparison of the putative lead plaintiff groups. It asserts that "[in contrast to the two other movants, the Massachusetts Group] is the only lead plaintiff applicant that has demonstrated its dedication to the vigorous prosecution of this action .... [and it] is exactly the type of lead plaintiff that Congress envisioned ...[,] large institutional investors with a significant stake in the outcome..." Massachusetts Group Opp., p. 1. Additionally, the Massachusetts Group argues:

> Here, the information submitted by [the Massachusetts Group] in its sworn certifications is accurate and complete, in contrast to that submitted by the Poppe Group. In addition, [the Massachusetts Group] is the only lead plaintiff applicant that has sought to protect the interests of the Class from being impaired by DDi's bankruptcy. Further, [the Massachusetts Group], unlike the Poppe Group, satisfies the Congressional preference for the ap-

pointment of sophisticated institutional investors as lead plaintiff. Consequently, despite the fact that the Poppe Group claims a nominally larger collective loss than [the Massachusetts Group], [the Massachusetts Group] is the most adequate plaintiff and should be appointed as lead plaintiff in this action.

*Id.*, pp. 9–10; see also Massachusetts Group's Reply Memo., pp. 1–2 (stating that it "is the *only* proposed lead plaintiff who has: (1) the largest financial interest in the litigation; (2) submitted sworn certifications and declarations attesting to the procedures they have implemented to minimize attorneys fees and litigation expenses; (3) made an appearance and filed objections in DDi's bankruptcy action; (4) filed a motion to preserve relevant evidence; (5) hired a single local law firm with a Los Angeles office; and (6) submitted an accurate loss chart.") (emphasis in original).

These arguments are insufficient to rebut the presumption that the Poppe Group is the most adequate plaintiff in the instant action.[6] Although the court may compare putative lead plaintiffs when assessing financial stake, once the statutory presumption has attached, it cannot be rebutted through relative comparison. *See Cavanaugh*, 306 F.3d at 732 (noting that "the Reform Act provides in categorical terms that the *only* basis on which a court may compare plaintiffs competing to serve as lead is the size of their financial stake in the controversy. Once it determines which plaintiff has the biggest stake, the court must appoint that plaintiff as lead, unless it finds that he does not satisfy the typicality or adequacy requirements.") (emphasis in original); *Cendant*, 264 F.3d at 269 (noting that a presumption of adequate representation might be rebutted in light of evidence that the presumptive plaintiff had no legitimate reason for choosing its counsel and that opposing plaintiffs had selected more qualified counsel and negotiated a bet-

ter fee agreement). The Massachusetts Group proffers no evidence that the Poppe Group will not fairly and adequately protect the interests of the class, nor does it assert that the Poppe Group is subject to unique defenses. As a result, the court concludes that the Massachusetts Group has failed to rebut the statutory presumption, and appoints the Poppe Group as Lead Plaintiffs.

**C. Appointment of Lead Class Counsel**

The Reform Act directs that once the court has designated a lead plaintiff, that plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v). A court may disturb the Lead Plaintiff's choice of counsel only if it appears necessary to "protect the interests of the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(aa); *Cavanaugh*, 306 F.3d at 732 n. 11 ("Congress gave the lead plaintiff, and not the court, the power to select a lawyer for the class.") The Poppe Group has indicated that it wishes to retain the law firm of Schiffrin & Barroway, LLP, a firm in Pennsylvania, as Lead Counsel. They would also like to have Lim, Ruger & Kim, LLP, a firm in Los Angeles, appointed as liaison counsel.

The court has reviewed Schiffrin & Barroway, LLP's résumé, and is satisfied that it is capable of serving competently in the role of Lead Counsel. The firm has experience litigating securities fraud class actions on behalf of individual investors, and its briefing to date indicates a familiarity with the applicable law. Accordingly, this aspect of Lead Plaintiffs' request is granted. The court also finds that Lim, Ruger & Kim is capable of fulfilling the role of liaison counsel.[7] As one court has noted, "This court has demonstrated a strong preference for local liaison counsel when securities fraud class actions are filed by out-of-state lawyers. It facilitates communication and ensures that out-of-state

---

6. It is noteworthy that the objections relied upon by the Massachusetts Group were filed by Raymond Ferrari, Jason T. Sunderland, Herbert Rodewald, and Stanley Sved, individual class action plaintiffs, who are not members of the Massachusetts Group. *See* Behar Decl. in Opp. to Competing Mots., Exs. B & C. Neither party in the Massachusetts Group is referenced in the objections filed before the bankruptcy court.

7. The court advises counsel, however, that it will monitor litigation activity, and closely scrutinize any fee requests ultimately submitted to ensure that they are reasonable. The Reform Act expressly limits attorneys' fees to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." *See* 15 U.S.C. § 78u–4(a)(6).

lawyers are familiarized with local rules and practices. It also ensures that if a court appearance is necessary on short notice or for a minor matter, a legal representative of the litigant can be available quickly, and without the expense of out-of-state travel." *de la Fuente v. DCI Telecomm., Inc.*, 269 F.Supp.2d 229, 232–33 (S.D.N.Y.2003).

## D. Preservation of Evidence

■ The Massachusetts Group requests that the court order Defendants to preserve all relevant documents and evidence related to the litigation in accordance with the Reform Act's provisions in order to "prevent the loss of key documents, whether through inadvertence or otherwise." Massachusetts Group Motion to Consolidate Related Actions and to Preserve Relevant Evidence, p. 5. The Act provides, in relevant part:

> During the pendency of any stay of discovery pursuant to this paragraph, unless otherwise ordered by the court, any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(b)(3)(C)(i). The statute provides sanctions for violation of the automatic preservation requirement. *See* 15 U.S.C. § 78u–4(b)(3)(C)(ii).[8]

Defendants object.[9] They maintain that it is inappropriate to enter an order directing the preservation of evidence absent a showing that Defendants have violated the duty imposed on them by statute. Defs.' Opp., p. 3. To demonstrate that there has been no violation of duty, Defendants proffer the declaration of their attorney, Jay Gandhi. Gandhi states that affirmative steps have been taken to preserve evidence in accordance with the Reform Act's requirements. In particular, he represents that an "e-mail was

sent to all DDi employees regarding this litigation and their duty to preserve documents. Individual letters also were sent to Defendants regarding document preservation." Gandhi Decl. ¶ 2.

Given that the statute specifically imposes a duty on Defendants to preserve evidence, that Defendants represent they have complied and will comply with the statute, and that plaintiffs have adduced no evidence of non-compliance, the court declines to enter an order mandating the preservation of evidence. *See In re Grand Casinos, Inc., Sec. Litig.*, 988 F.Supp. 1270, 1273 (D.Minn.1997) (declining to order the preservation of evidence because "the preservation of evidence in the possession of the parties is statutorily automatic"); *see also Schnall v. Annuity & Life RE (Holdings), Ltd.*, 2004 WL 51117, *2 (D.Conn. Jan.2, 2004) (denying a motion for a preservation order because defendants "have actual notice of the allegations against them [and] in their responses to plaintiffs' motion ... have affirmatively stated that they are fully aware of their obligations under the PSLRA and the sanctions for failure to comply"); *In re Tyco Int'l, Ltd., Sec. Litig.*, 2000 WL 33654141, *2 (D.N.H. July 27, 2000) (denying plaintiffs' request for a preservation order "because such an order would either unnecessarily duplicate or improperly alter the obligations created under the [Reform Act]," and noting that "[a]bsent a showing that defendants are not acting in accordance with their statutory duty, the [Reform Act's] preservation provision should be sufficient to ensure the preservation of relevant evidence in the defendants' custody or control").

Lastly, the Massachusetts Group contends that it is appropriate to order the preservation of evidence because "[i]t would put those parties and witnesses with potential relevant evidence on 'actual notice,' as required by the [Reform Act]". Massachusetts Group Reply to Defs.' Opp., p. 3. It is concerned that assets containing potentially relevant information might be sold or destroyed to third parties and that once an asset is sold to a

8. "Sanction for willful violation. A party aggrieved by the willful failure of an opposing party to comply with clause (i) may apply to the court for an order awarding appropriate sanctions."

9. The court declines the Massachusetts Group's request to strike Defendants' opposition. Defendants' opposition, particularly to the request for the preservation of evidence, is appropriate.

612

third party, counsel for Defendants will have no authority to preserve that evidence. First, only parties are subject to the Reform Act's preservation requirements. *See* 15 U.S.C. § 78u–4(b)(3)(C)(i). Second, it is unclear whether the court could exercise jurisdiction over third party witnesses or potential purchasers of DDi's assets. *See In re Grand Casinos,* 988 F.Supp. at 1273 ("Plaintiffs also requested an Order which would mandate the preservation of all documents, and other tangible evidence ... whether the evidence was in the care, custody or control of the parties to this action, or in that of a third-person or persons... [W]e are aware of no authority which would subject third-persons to our jurisdiction."); *see also Asset Value Fund Ltd. Partnership v. Find/Svp, Inc.,* 1997 WL 588885, *1 (S.D.N.Y. Sept.19, 1997) (noting that there is no statutory authority to extend a preservation order to non-parties, it was not clear the court would have any jurisdiction over them, and there was no showing of a prospect of spoliation of evidence). Given the jurisdictional concerns, and the fact that the Massachusetts Group has proffered no evidence indicating that third parties have attempted to destroy relevant evidence, the court declines to duplicate the statutory requirement by issuing such an order.

## IV. *CONCLUSION*

For the foregoing reasons, the court GRANTS the Poppe Group's motion for appointment as lead plaintiff and approves its selection of lead and liaison counsel. The court DENIES the Massachusetts Group's and MERSL's motions for appointment as lead plaintiff and for selection of lead counsel. The Massachusetts Group's motion to preserve relevant evidence is DENIED.

IT IS SO ORDERED.